FEDERAL TRADE COMMISSION, Plaintiff,

v.

COMMERCE PLANET, INC., a corporation, and Michael Dill Charles Gugliuzza, and Aaron Gravitz individually and as officers of Commerce Planet, Inc., Defendants.

Case No.: 8:09–cv–01324–CJC(RNBx).

United States District Court, C.D. California, Southern Division.

June 22, 2012.

Eric D. Edmondson, David M. Newman, Kerry O'Brien, Evan Rose, Federal Trade Commission, San Francisco, CA, Raymond E. McKown, Federal Trade Commission, Los Angeles, CA, for Plaintiff.

Vatche Chorbajian, San Diego, CA, Alan A. Greenberg, Wayne R. Gross, Michael A. Piazza, Greenberg Traurig LLP, Irvine, CA, for Defendants.

## MEMORANDUM OF DECISION

CORMAC J. CARNEY, District Judge.

### I. INTRODUCTION

The Federal Trade Commission ("FTC") brought this action for injunctive and monetary equitable relief against Commerce Planet, Inc. ("Commerce Planet") and several of its directors and officers, including Michael Hill, Aaron Gravitz, and Charles Gugliuzza (collectively, "Defendants"), for deceptive and unfair business practices arising from Defendants' website marketing of a web creation and hosting service called OnlineSupplier. OnlineSupplier was marketed as a free "Online Auction Starter Kit" that purported to help consumers sell products on eBay. Consumers were permitted a free trial period to use OnlineSupplier with payment of a small shipping and handling fee. If consumers did not cancel the service within the trial period, they were automatically charged a recurring monthly fee ranging from $29.95 to $59.95. The FTC alleges that during the relevant time period (July 2005 to March 2008), Defendants deceptively marketed OnlineSupplier as a free auction kit on its website without adequately disclosing the program's negative option plan, which required consumers to affirmatively cancel their membership or otherwise incur a monthly charge to their credit card. The FTC alleges that consumers unwittingly signed up for OnlineSupplier, believing they had ordered a free kit, only to discover later that they had been enrolled in OnlineSupplier's continuity program when they saw monthly charges on their credit card bill. The FTC alleges that between July 2005 and March 2008, Commerce Planet obtained over $45 million from over 500,000 consumers.

The FTC settled with all Defendants except for Mr. Gugliuzza, Commerce Planet's former president and consultant from July 2005 to November 2007. In the operative First Amended Complaint ("FAC"), the FTC asserts two counts against Mr. Gugliuzza for (i) deceptive practices and (ii) unfair practices in violation of section 5(a) of the Federal Trade Commission Act (the "FTC Act" or "Act"), 15 U.S.C. § 45(a). The FTC requests injunctive and monetary equitable relief against Mr. Gugliuzza under section 13(b) of the FTC Act, 15 U.S.C. § 53(b). Between January 31, 2012 and February 28, 2012, the Court conducted a sixteen-day bench trial that involved over 300 exhibits and 22 witnesses. The parties thereafter submitted extended closing briefs. The Court, by this Memorandum of Decision, issues its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). After carefully reviewing all the evidence, testimony, and arguments presented by the parties' counsel, the Court concludes that the FTC has proven by a preponderance of the evidence that Mr. Gugliuzza is individually liable for the deceptive and unfair marketing of OnlineSupplier in violation of section 5(a) of the FTC Act. The Court finds that a permanent injunction against Mr. Gugliuzza is appropriate because there is a cognizable danger that he will repeat the deceptive and unfair marketing tactics he authorized and implemented with OnlineSupplier. The Court also finds that monetary equitable relief against Mr. Gugliuzza is proper in the amount of $18.2 million as restitution for his wrongful and knowing participation in the deceptive marketing of OnlineSupplier.

## II. BACKGROUND

Commerce Planet marketed and sold OnlineSupplier, a webhosting service that purported to provide consumers an inexpensive platform to sell products online. Commerce Planet hired Mr. Gugliuzza to provide an assessment of the company and recommend ways to improve its profitability. From July 2005 to November 2007, Mr. Gugliuzza served in various capacities as the company's consultant, president, *de facto* executive and in-house counsel, and director. Mr. Gugliuzza helped transition the company from telemarketing to internet marketing of OnlineSupplier, whereby consumers could sign up for the program from its website. Internet sign-ups of OnlineSupplier dramatically improved the company's revenue. At the same time, numerous consumers complained to the Better Business·Bureau ("BBB"), the Attorney General, and to Commerce Planet regarding confusion as to the nature and cost of OnlineSupplier and demanded refunds. OnlineSupplier was also subject to excessive credit card chargebacks. In March 2008, the FTC served a civil investigative demand ("CID") on Commerce Planet, after which Commerce Planet changed its webpages for OnlineSupplier under the guidance of outside counsel knowledgeable in FTC Act compliance. Sales of OnlineSupplier thereafter plummeted. In November 2009, the FTC filed suit against Commerce Planet and three of its key officers and employees, Messrs. Hill, Gravitz, and Gugliuzza, for their alleged involvement in the deceptive and unfair marketing of OnlineSupplier during the relevant time period.

### A. The Parties

The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41–58. The FTC enforces section 5(a) of the Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices affecting commerce. The FTC is authorized to bring suit in federal court to enjoin violations of the Act and to

secure an array of suitable equitable relief, including consumer redress. 15 U.S.C. § 53(b).

Commerce Planet is a Utah corporation with its headquarters in Goleta, California. (Exhs. 1175, 2043–2051.) Commerce Planet began operations as NeWave, Inc. ("NeWave"),[1] which was founded by Messrs. Gravitz and Hill at the end of 2003 and taken public in January 2004. (Gravitz, 2/1/12, 140:1–3; Hill, 2/7/12, 111:1–18; Hill 2/17/12, 72:23–25.)[2] Through NeWave's subsidiary at the time, Online Supplier, Inc., the company began marketing and selling an online web creation and hosting service called OnlineSupplier. (Exh. 31.) Effective June 2006, NeWave changed its name to Commerce Planet, Inc. (Exhs. 31, 2043–2051.) Commerce Planet began operations as a holding company and conducted its business through three wholly-owned subsidiaries: Consumer Loyalty Group, Inc. ("CLG"), Legacy Media, LLC ("Legacy Media"), and Ivenia, LLC ("Ivenia"). (Id.) Mr. Hill served as the company's Chief Executive Officer from 2004 to September 2007, after which he remained as the company's Chief Strategic Officer until December 2008 when he left the company. (Hill, 2/7/12, 111:19–112:1, 112:17–18.) Mr. Gravitz, who served as the head of media at NeWave, was president of Legacy Media from 2006 until December 2008 when he left the company. (Gravitz, 2/1, 6:14–19; 2/22, 12:25–13:2.) Mr. Gugliuzza served as the company's titular consultant from July 1, 2005 to September 2006. (Gugliuzza, 2/21/12, 110:25–111:5; Exh. 1035.) From September 11, 2006 to November 5, 2007, Gugliuzza served as president of Commerce Planet. (Gugliuzza, 2/21/12, 110:21–24, 116:3–13; Exhs. 228, 259–60.) Commerce Planet was only licensed to do business in California but received customer orders nationwide and from international locations. (Exh. 31.)

During the relevant time period, Legacy Media functioned as the marketing and advertising arm of Commerce Planet and shared the same office as the parent company. (Gravitz, 2/1/12, 82:19–83:1, 163:3–6, Exh. 31.) CLG handled the customer service component of the company and also shared the same office as Commerce Planet. (Exh. 31.) Christopher Seidel, who joined NeWave in 2004 and served as the company's vice president of operations, was the president of CLG from 2006 until his departure in 2009. (Seidel, 2/14/12, 52:7–11, 67:9–16; Exhs. 318, 1292a–24.) José Guardiola served as CLG's customer service manager from August 2006 to August 2007. (Guardiola, 2/21/12, 4:19–15, 7:3–4, 35:23–24.) Paul Daniel was Commerce Planet's Chief Financial Officer from July 2005 to May 2006. (Daniel, 2/14/12, 15:23–16:2.) David Foucar replaced Mr. Daniel as CFO from June 2006 to October 2007. (Foucar, 2/16/12, 130:19–23, 161:16–18.) Jaime Rovelo served as the company's final CFO from the end of 2007 to February 2009. (Rovelo, 2/10/12, 4:20–22, 5:20–25, 33:1–2.) The company's in-house counsel was Jeffrey Conrad from mid–2004 to the end of 2006. (Conrad, 2/8/12, 40:20–25, 86:19–24.) Paul Huff replaced Mr. Conrad as Commerce Planet's in-house counsel from 2007 until August 2008. (Huff, 2/15/12, 115:9–11; Exh. 117.) In January 2009, Commerce Planet's assets were acquired by Superfly and later purchased by Lenco Mobile, Inc. (Cruttenden, 2/28/12, 29:17–30:9, 33:13–21; Exh. 132.) Commerce Planet is currently no

---

1. Unless stated otherwise, Commerce Planet, Inc. and NeWave, Inc. are collectively referred to as "Commerce Planet" or the "company."

2. Testimony from trial is cited using the last name of the witness, the date, and page number of the trial transcript.

longer in business. (Cruttenden, 2/28/12, 24:16–17.)

### B. OnlineSupplier

Commerce Planet primarily marketed and sold OnlineSupplier. (Exh. 31.) The bulk of company's revenue was generated from OnlineSupplier and associated upsell products. (Gravitz, 2/1/12, 7:16–20, 133:16–134:9; Hill 2/7/12, 159:10–18.) Messrs. Gravitz and Hill developed the concept for OnlineSupplier. (Hill, 2/7/12, 112:25–113:5.) OnlineSupplier was a website hosting service designed to enable consumers to create and manage a website to sell products on that site and on other internet sites. (Gravitz, 2/1/12, 6:20–7:3.) The service included a hosted website created by the customer; access to an inventory of products; access to the customer service department; and an information kit consisting of a 23–page manual on how to use the service and program. (Gravitz, 2/1/12, 140:12–146:11; Exhs. 31, 2003.) Consumers signed up for OnlineSupplier initially by telephone and then later online on its webpages by entering their shipping address and credit card information. (Exh. 31.) Consumers paid for the initial handling and shipping fee of $1.95 (or $7.95 for expedited delivery) for the membership kit. (Exhs. 1270–2, 1271–2.) Consumers were permitted a free trial period ranging from 7 to 14 days to use the product and services. (Exhs. 1270–1, 1271–1.) If consumers did not cancel within the free trial period, they were automatically enrolled in the continuity program and charged a monthly membership fee ranging from $29.95 to $59.95 on their credit card. (Gravitz, 2/1, 66:25–67:5, 111:13–20; Gravitz, 2/2/12, 25:5–9, Hill, 2/17/12, 123:16–22.) Commerce Planet initially maintained its own warehouse from which goods were sold to customers. (Exh. 31.) The warehouse was discontinued in 2006, and products were subse-

quently offered to customers through Ingram Micro. (Seidel, 2/14/12, 100:8–101:12; Hill, 2/17/12, 115:23–117:20.) To cancel the service, customers could either call or email customer service at CLG. (Seidel, 2/14/12, 108:17–24.)

### 1. Marketing

When Commerce Planet began operations in 2003, it initially marketed OnlineSupplier through classified advertising, newspapers, and emails, and the program was primarily sold through inbound telemarketing whereby consumers would call a toll-free number to sign up for the service. (Gravitz, 2/1/12, 7:4–6, 8:1–7; Hill, 2/7/12, 11:16–24.) At first, Commerce Planet charged consumers a flat fee of $58 or $98.90 for OnlineSupplier, depending on the particular package consumers purchased, and there was no free trial period or a negative option plan. (Gravitz, 2/1/12, 10:12–18.) However, the sale of OnlineSupplier was poor, and the company lost money. (*Id.* at 155:12–17; Hill, 2/17/12, 131:17–24.) The company later transitioned from telemarketing to online marketing between June and July 2005. (Gravitz, 2/1/12, 11:5–10; Seidel, 2/14/12, 56:6–16.)

### 2. Sign–Up Pages

Between July 2005 and March 2008, there were two versions of OnlineSupplier's sign-up pages. (Exhs. 1270, 1271.) The first working version was complete around July 2005. (Gravitz, 2/1/12, 17:15–24.) After several revisions, the final sign-up pages of the first version ("Version I") went live in October 2005. (Gravitz, 2/1/12, 21:11–19, 27:1–4; Gravitz, 2/2/12, 107:21–108:5; Hill, 2/17/12, 117:21–118:4; Exh. 1270.) Mr. Gravitz developed Version I in 2005 and 2006 with the legal advice of Jeff Conrad and Mr. Gugliuzza. (Gravitz, 2/1/12, 27:11–22; Gravitz, 2/2/12, 114:2–5.) Another version of the sign-up pages ("Version II") was used after some

modifications were made to Version I in February 2007. (Gravitz, 2/1/12, 109:22–111:24; Exhs. 1271, 1198.) A third version of the sign-up pages ("Version III") was used after the FTC's CID on Commerce Planet in March 2008. (Exh. 1272.) Version III incorporated changes under the recommendations of outside counsel, Linda Goldstein, who had expertise in FTC Act compliance. (Gravitz, 2/1/12, 127:9–132:10; Huff, 2/15/12, 93:13–95:22; Roth, 2/8/12, 17:19–18:13; Exhs. 232, 1204, 1272.) Version III did not mention a free auction starter kit and significantly clarified the terms of membership on the landing and billing pages. (Exh. 1272.) After implementing the changes in Version III, the company experienced a severe downward spike in sales of OnlineSupplier. (Roth, 2/8/12, 21:1–14.)

The internet sign-up process of OnlineSupplier involved four steps. First, through affiliate marketing, such as emails and ads, consumers were directed to OnlineSupplier's website. (Gravitz, 2/1/12, 11:5–10, 12:11–13:20, 35:9–36:3; Exhs. 1274, 1277.) The landing page of the website represented OnlineSupplier as a free "Online Auction Starter Kit" that provided information to consumers on how to sell products on eBay. (Exhs. 1270–1, 1271–1.) Consumers could obtain a free kit if they filled out their shipping address and clicked the "Ship My Kit!" button. (Id.) Second, upon clicking the "Ship My Kit!" button, consumers were directed to the billing page where they could select their shipping method and submit their credit card information. (Exhs. 1270–2, 1271–2.) On the bottom of the landing and billing pages, below the "Ship My Kit!" button, there was a hyperlink to the "terms and conditions," which popped up on a separate page. (Exhs. 1270, 1271.) The terms and conditions page included information about OnlineSupplier's services, fees, and legal conditions, including the automatic charge

of the monthly membership fee if consumers did not cancel within the trial period. (Id.) At the bottom of the billing pages, in fine print, there was also a disclosure about the negative option plan and membership fee. (Exhs. 1270–2, 1271–2.) The first draft of this disclosure was prepared by Mr. Gravitz using a competitor's site and circulated to management, including Mr. Gugliuzza, for review. (Gravitz, 2/1/12, 71:3–10.) Clicking on the "Ship My Kit!" button on the billing page completed the order for OnlineSupplier. (Exhs. 1270–2, 1271–2.) Third, after submitting their credit card information and clicking the "Ship My Kit!" button, consumers were directed to the upsell page, where they could chose additional products and services for a monthly or annual fee. (Exhs. 1270–3, 1271–3.) The products and services were pre-clicked to "Yes," but the consumer could change it to "No." (Id.) Fourth, upon clicking the "Submit" button on the upsell page, consumers were directed to the final confirmation page with the order information. (Exhs. 1270–4, 1271–4.) Commerce Planet experimented with sending post-transaction confirmation emails to consumers before charges to credit cards were posted, but these were inconsistently used and discontinued after a brief period of time. (Guardiola, 2/21/12, 11:20–25, 16:14–23; King, 2/3/12, 157:10–19.)

### 3. Consumer Complaints and Chargebacks

More than 500,000 consumers completed OnlineSupplier's sign-up process during the relevant time period. (Exh. 2061.) The transition to online sign-ups was followed by dramatic increases in company profits. From 2005 to 2006, when the company transitioned to online sign-ups, the company swung from over a 6.2 million-dollar net loss to over an 8.7 million-dollar net profit. (Foucar 2/16/12, 152:18–

153:14; Exh. 2044.) At the same time, the company started to receive high volumes of telephone and written complaints from consumers who were confused over the nature of the service and terms of membership and demanded refunds. (Guardiola, 2/21/12, 31:20–32:13; Exhs. 163, 193, 1180, 1177–79, 1292a, 1293, 1295.) In numerous instances, consumers first became aware that they had been enrolled in a negative option plan when they received a credit card bill with a charge for membership to OnlineSupplier. (Gravitz, 2/1/12, 165:17–24.) OnlineSupplier also was subject to excessive credit card chargebacks in 2006 and 2007, leading to fines of more than one million dollars during this time. (Chen, 2/3/12, 5:9–23; Exhs. 1312, 1058–62, 1317–19, 1321–22.)

## C. Role of Charles Gugliuzza

Mr. Gugliuzza was employed with Commerce Planet as a consultant and president from July 2005 to November 2007 and retained a seat on the company's Board as an outside director until May 2008. (Gugliuzza, 2/21/12, 118:10–17, 122:18–20; Exh. 235.) Before joining Commerce Planet, Mr. Gugliuzza graduated from Loyola Law School and cofounded a company called eBatts with a law school friend. (Gugliuzza, 2/21/12, 102:1–20.) EBatts operated a consumer direct website that sold batteries, adapters, and chargers for laptops, cell phones, and digital cameras manufactured by Battery–Biz, the family business of his law school classmate. (*Id.*) Mr. Gugliuzza held the position of Chief Operating Officer at eBatts. (*Id.* at 103:16–17.) EBatts was financially successful and became the exclusive supplier for Duracell's camcorder and digital camera batteries. (*Id.* at 103:19–104:9.)

Mr. Gugliuzza left eBatts to start his own business, American Power Supplies, a webstore that locally purchased products similar to those at eBatts and sold them directly to consumers via the internet. (*Id.* at 104:17–105:17.) Again, Mr. Gugliuzza had financial success with American Power Supplies. (*Id.* at 105:18–20.) Mr. Gugliuzza sold his interest in American Power Supplies to his business partner after selling back his interest in Battery–Biz and signing a noncompete clause with Battery–Biz. (*Id.* at 105:21–106:7.)

### 1. Consultant (July 2005 to September 2006)

After he sold his interest in American Power Supplies, Mr. Gugliuzza sent a letter to NeWave's Board of Directors in April 2005, seeking the position of CEO. (Exh. 3.)[3] In May 2005, NeWave's Board of Directors retained Mr. Gugliuzza as a consultant to conduct an assessment of the company and identify ways to increase profits and decrease costs. (Gugliuzza, 2/21/12, 108:7–21; Hill, 2/7/12, 115:24–116:24, 117:5–11). Mr. Gugliuzza performed consulting work through his business called Olive Tree Holdings. (*Id.* at 108:7–21; Exh. 6.) Mr. Gugliuzza conducted a one-month assessment of NeWave and submitted a 78–page report of his evaluation and recommendations to the company's Board in June 2005. (Gugliuzza, 2/21/12, 108:7–21; Exh. 6.) The report provided a detailed, comprehensive assessment of Commerce Planet and its subsidiaries, including the company's management, infrastructure, operations, finances, products and services, and marketing and advertising. Some of the core deficiencies Mr. Gugliuzza identified in the report in-

---

**3.** Mr. Gugliuzza had been initially introduced to Commerce Planet through an investor of the company when he left eBatts. Mr. Gugliuzza met with Mr. Hill but decided not to work for NeWave and instead founded American Power Suppliers. (Gugliuzza, 2/21/12, at 106:8–21.)

cluded the discrepancy between perceived value and actual value; management's lack of experience and skill to effectively operate the company and implement change; lack of well-established channels of communication and coordination between managers; and "[a] lack of value added products and services that produce high profit margins and customer retention," among others. (Exh. 6.) Mr. Gugliuzza recommendations included a "complete overhaul" with respect to the company's existing decision making process; improvements in the channel of communication between management to clarify expectations and responsibilities for projects; and enhancements to coordination efforts between departments. (*Id.*) Specifically, with respect to marketing, Mr. Gugliuzza noted the lack of coordination between marketing and sales. (*Id.*) Mr. Gugliuzza also emphasized that because "existing management lack[ed] experience," management was "in dire need of a leader" who possessed basic management skills. (*Id.*) Mr. Gugliuzza also observed that customer retention was extremely low with an average of less than 35% after the first 45 days of billing activity. (*Id.*) He identified marketing expenditures as comprising the largest portion of NeWave's expense budget and the company's media budget to be the largest contributor to its negative net profits, aside from payroll. (*Id.*) Mr. Gugliuzza provided more specific recommendations with respect to the company's human resources, infrastructure, operations, products and services, and budgets. For example, Mr. Gugliuzza recommended that Messrs. Hill and Gravitz be replaced as the CEO and head of Media, respectively, so they could focus their attention on developing revenue generating opportunities. (*Id.*) Mr. Gugliuzza recommended that Mr. Hill remain as president and Mr. Gravitz be in charge of business development. (*Id.*)

From July 1, 2005 to September 2006, Mr. Gugliuzza held the titular position of consultant to Commerce Planet. (Gugliuzza, 2/21/12, 110:25–111:5; Exh. 1035.) Mr. Gugliuzza was also a director of the company beginning in August 2006. (Exhs. 31, 1247.) After Mr. Gugliuzza conducted an assessment of the company, the Board of Directors hired him to implement the recommendations in his report. (Hill 2/7/12, 125:20–126:21; Gugliuzza, 2/21/12, 109:10–18; Exh. 1246.) Mr. Gugliuzza executed a "Corporate Consulting Agreement" with NeWave, dated June 28, 2005. (Exh. 1035.) The consulting agreement provided that, as a consultant, Mr. Gugliuzza, "shall assist in implementing operating strategies and procedures as prescribed by the Company's Board of Directors, and pursuant to the Consultant's Company Performance Assessment Report dated June 14, 2005" and "shall also use [ ] best efforts to introduce the Company to potential vendors, customers or business partners which would be beneficial to the Company's business." (*Id.*) Under the consulting agreement, Mr. Gugliuzza was paid $5000 in cash per week, with a signing and performance bonus. (*Id.*) Although the consulting agreement lasted three months, it had a renewable option under the same terms, and Mr. Gugliuzza renewed his contract until he became president in 2007. (Hill, 2/7/12, 131:5–20.)

The Board of Directors tasked Mr. Gugliuzza with the goal of reducing cost and increasing revenue. (Hill, 2/17/12, 120:6–121:7.) Although Mr. Gugliuzza held the title of consultant, the Board conferred broad, management authority upon Mr. Gugliuzza over the company's departments and daily operations, including over Mr. Gravitz, marketing, and customer service. (Hill, 2/7/12, 128:3–130:9, 137:20–138:7; Daniel, 2/14/12, 28:1–14; Gravitz, 2/2/12, 122:3–11.) Messrs. Gugliuzza and Hill comprised the company's executive staff,

and by around March 2006, they were being compensated under the same terms. (Hill, 2/7/12, 142:4–7, 150:10–20; Hill 2/17/12, 130:4–9; Exhs. 16, 1331.) Mr. Gugliuzza regularly met with and communicated with all the department heads, who were required to submit weekly reports to him. (Gugliuzza, 2/23/12 Vol. I, 57:8–11; Seidel, 2/14/12, 58:6–59:22, 61:19–24; Exhs. 1124, 1129, 1130, 1132, 1354, 1356, 1368–71, 1292a, 1293, 1295.) Mr. Gugliuzza, along with Hill, oversaw the company's migration of OnlineSupplier from telemarketing to internet sales in 2005. (Hill, 2/17/12, 122:1–4; Daniel, 2/14/12, 28:15–23.) Mr. Gugliuzza also acted as *de facto* legal counsel of NeWave and took over Mr. Conrad's role as the primary legal reviewer for the company. (Gravitz, 2/2/12, 120:6–12; Gugliuzza, 2/22/12, 119:5–14.) After Mr. Gugliuzza implemented many of the recommendations in his assessment report, the company became profitable. (Hill, 2/7/12, 143:10–24.)

### 2. President (September 2006 to November 2007)

Pursuant to an executive agreement, Mr. Gugliuzza became the president of the company, effective September 11, 2006. (Hill, 2/7/12, 152:21–153:10; Exhs. 259.) He signed another executive employment agreement on April 10, 2007. (Exh. 261.) Gugliuzza served as president until he stepped down on November 5, 2007. (Gugliuzza, 2/21/12, 110:21–24, 116:3–13; Exhs. 228, 259–61.) Mr. Hill remained the CEO, and David Foucar became the CFO. (Hill, 2/7/12, 151:19–152:1.) Although Mr. Gugliuzza assumed the title of president, as a practical matter, his duties and responsibilities did not materially change. (*Id.* at 153:18–25.) Mr. Gugliuzza continued to assert operational control over the company and its subsidiaries and had oversight authority over the department heads. (Foucar, 2/16/12, 137:19–138:6.)

Mr. Gravitz reported to Mr. Gugliuzza, and Mr. Gugliuzza directed the marketing of OnlineSupplier, such as by reviewing and approving marketing agreements, approving landing and billing pages of OnlineSupplier, and reviewing weekly performance reports. (Hill, 2/7/12, 155:11–20.) Mr. Seidel also continued to report to Mr. Gugliuzza. (Seidel, 2/14/12, 67:9–16, 68:16–18.) After Mr. Huff was hired in 2007, Mr. Gugliuzza delegated some of his legal responsibilities to Mr. Huff, but remained the final authority on legal matters. (Gravitz, 2/1/12, 35:1–8; Gravitz, 2/2/12, 120:14–19; Hill, 2/7/12, 141:16–142:13.)

On November 5, 2007, Mr. Gugliuzza stepped down as president, and Anthony Roth took over as the company's CEO and president. (Roth, 2/8/12, 9:1–9; Exhs. 228, 234.) Mr. Gugliuzza continued working for the company as a consultant until December 31, 2007. (Gugliuzza, 2/21/12, 116:14–17, 117:4–19; Exh. 235.) At the end of 2007, Commerce Planet repurchased from Mr. Gugliuzza his 1.8 million shares of company stock in exchange for $185,000 cash down, $90,400 in additional payment terms, and a $427,000 promissory note, pursuant to a Share Repurchase Agreement on December 26, 2007. (Roth, 2/8/12, 10:10–12:1; Exhs. 264, 265.) Mr. Gugliuzza did not receive payment on the promissory note and received a total of $275,400 for the purchase of his company stock. (Rovelo, 2/10/12, 9:24–11:2; Exhs. 138, 264.) Mr. Gugliuzza remained on the company's Board as an outside director until May 2008. (Gugliuzza, 2/21/12, 118:10–17, 122:18–20; Exh. 1175.) From 2006 to 2007, Mr. Gugliuzza received over $3 million in compensation, bonuses, stock awards, and option awards for his services at Commerce Planet. (Rovelo, 2/10/12, 6:8–15:10, 36:18–36:7; Exhs. 138, 264, 1042.)

After leaving Commerce Planet, Mr. Gugliuzza founded a company called Grow Commerce with one partner, Jaime Stafford, the original founder of Iventa. (Gugliuzza, 2/21/12, 124:20–125:17.) Grow Commerce was founded on the assets of Iventa. Grow Commerce built, operated, and managed websites for other companies to sell products; managed fulfillment; and provided warehouse and customer service. (*Id.* at 125:18–126:5.) Grow Commerce did not engage in direct consumer sales but serviced other companies and did not include a monthly membership, or negative option plan. (*Id.* at 127:25–127:13.) Mr. Gugliuzza was a principal of Grow Commerce and owned 49% of that company. (*Id.* at 126:6–10.) Grow Commerce was financially successful, and the company was sold within several months. (*Id.* at 127:14–19.) Mr. Gugliuzza then obtained an MBA degree from the University of Southern California, after which he worked for Oakley, a sunglass company, as an e-Commerce strategy manager. (*Id.* at 124:7–11, 128:20–129:3.) Mr. Gugliuzza supported Oakley's large e-commerce account that consisted of business-to-business sales of sunglasses to such companies as Amazon and Zappos. (*Id.* at 129:4–20.) Oakley does not utilize a monthly membership or negative option plan. (*Id.*) Mr. Gugliuzza left Oakley three days before trial. (*Id.* at 129:21–130:1.)

### D. Procedural History

In March 2008, the FTC served a CID on Commerce Planet. (Gravitz, 2/1/12, 48:3–6; Roth, 2/8/12, 17:19–18:13.) The FTC filed suit against Defendants on November 10, 2009. (Dkt. No. 1.) Shortly thereafter, the FTC settled with Commerce Planet, Mr. Hill, and Mr. Gravitz, and final judgments for permanent injunction and equitable monetary relief in the amount of $19,730,000 were entered against them on November 18, 2009.

(Dkt. Nos. 3–5, 7–9.) The parties agreed to suspend the judgment for monetary relief under certain conditions, including the payment of $100,000 by Commerce Planet, $330,000 in cash plus interest on a $100,000 loan by Mr. Hill, and $192,000 by Mr. Gravitz. (Dkt. Nos. 7–9; Hill, 2/7/12, 183:7–11; Hill, 2/17/12, 114:14–16.)

The FTC engaged in settlement discussions with Mr. Gugliuzza, but the parties were unable to reach a resolution. (Dkt. No. 142.) After the FTC and Mr. Gugliuzza engaged in substantial discovery, the FTC filed a motion for leave to amend the Complaint, which the Court granted. (Ct. Order, Dkt. No. 145, June 27, 2011.) The FTC filed the operative FAC on June 29, 2011. (Dkt. No. 147.) On July 18, 2011, Mr. Gugliuzza answered the FAC, asserting several affirmative defenses, including advice of counsel, reliance on professionals, good faith, and mootness. (Dkt. No. 149.) On July 27, 2011, Mr. Gugliuzza filed two motions for partial summary judgment, which the Court denied. (Ct. Order, Dkt. No. 164, Sept. 8, 2011.) The Court thereafter conducted its bench trial, and the parties submitted closing briefs. (Dkt. Nos. 242–43, 248–49.)

### III. INDIVIDUAL LIABILITY

The FTC alleges that Defendants engaged in deceptive and unfair website marketing of OnlineSupplier as a free "Online Auction Starter Kit" from July 2005 to March 2008 without adequately disclosing the program's negative option plan. (FAC ¶¶ 17–24, 48–53.) The FTC also alleges that Mr. Gugliuzza participated in, controlled, or had authority to control as well as knew about or should have known about Commerce Planet's deceptive and unfair practices related to the marketing of OnlineSupplier via his various roles as the company's consultant, president, *de facto* executive, and in-house counsel from July

2005 to November 2007. (*Id.* ¶¶ 38–43.) Based on these allegations, the FTC asserts two counts against Mr. Gugliuzza for deceptive and unfair practices under section 5(a) of the FTC Act.

## A. Deceptive Acts (Count I)

██ Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce" and empowers the FTC to prevent such acts or practices. 15 U.S.C. § 45(a)(1), (2). An act or practice is deceptive if (1) there is a representation, omission, or practice, (2) that is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir.1994), *cert. denied*, 514 U.S. 1083, 115 S.Ct. 1794, 131 L.Ed.2d 722 (1995). District courts consider the overall, common sense "net impression" of the representation or act as a whole to determine whether it is misleading. *See FTC v. Gill*, 265 F.3d 944, 956 (9th Cir.2001) (holding that defendant failed to counter the FTC's substantial showing that he made statements and created an overall "net impression" of a misleading representation regarding the ability to remove negative information from consumers' credit report, "even if the information was accurate, complete, and not obsolete"); *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir.2009) ("Deception may be found based on the 'net impression' created by a representation."). A misleading impression is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir.2006) (citation and quotes omitted).

The FTC's theory of the case is that Defendants offered a free internet auction kit as a ruse to enroll consumers in OnlineSupplier. Defendants thereby grossed over $45 million in two years by tricking over 470,000 consumers into unwittingly submitting their credit card information, which was used to charge them a monthly subscription fee without their informed consent. (Opening Statements, Trial Tr., 1/31/12, 5:25–6:15, 10:8–10.) At trial, the FTC attempted to show that OnlineSupplier's landing and billing pages, (Exhs. 1270, 1271), created the net impression that OnlineSupplier was a free offer, except for a small shipping and handling fee, and that although there was a disclosure of the negative option plan, consumers were unlikely to see or understand it because of the way it was placed on the sign-up pages. (Trial Tr., 1/31/12, 11:7–13.)

Mr. Gugliuzza denied liability and any wrongdoing on his part. He contended that OnlineSupplier was not a devious internet scheme, but a legitimate product that people wanted to use. (*Id.* at 20:24–21:7.) Mr. Gugliuzza argued that there was no empirical evidence of deception or unfairness arising from the negative option disclosures on OnlineSupplier's website. (Dkt. No. 187 [Def.'s Trial Brief], at 2.) Mr. Gugliuzza also argued that there was no evidence that consumers were deceived by the webpages, and any consumer confusion about OnlineSupplier resulted from third-party marketing fraud. (*Id.; see also* Trial Tr., 1/31/12, 22:18–23:8.)

██ The Court finds that the landing and billing pages of OnlineSupplier were materially misleading because those webpages created the net impression that consumers could obtain a free auction kit, when in fact, consumers were subscribing to a continuity program with monthly subscription fees. The clear weight of the evidence simply does not support Mr. Gugliuzza's position that affiliate fraud was the primary cause of consumer confusion.

That confusion was clearly caused by OnlineSupplier's misleading sign-up pages.

### 1. Version I Is Facially Misleading

The most compelling evidence that the website marketing of OnlineSupplier was misleading are the sign-up pages themselves. The landing and billing pages of the webpages created the net impression that OnlineSupplier was a free kit containing information on how to sell products online, rather than a continuity plan with a monthly membership fee. The central message on the landing page of Version I is that consumers will get a free kit that gives them information about how to sell products on eBay. (Exh. 1270.) When looking at the landing page, the most prominent graphic is the red boxed message on the upper left corner that states, "AS SEEN ON TV," which then leads the eye to the main message in caps "OVER $3.2 BILLION WAS MADE ON ebay LAST YEAR!" The phrase "$3.2 Billion" and "On ebay" are also in red, except that the eBay logo is in primary colors. Above this in smaller, dark blue font is the phrase "Work From Anywhere Using Your Computer!" Underneath the main headline about eBay is the message in a green banner that states "JOIN OVER 724,000 AMERICANS MAKING A LIVING ON EBAY." (Exhs. 1270–1, 1271–1.) Below the banner, the webpage is divided into two sections. The left section contains information about an "Online Auction Starter Kit" that "provides detailed instructions to maximize profits, using little known but proven strategies." Just below this statement in Version I is the directive "GET YOUR KIT NOW FOR FREE." The word "FREE" is in red, as is the phrase "STARTER KIT." The kit is advertised to include the following benefits: (1) a step-by-step quick start guide, (2) no experience required, (3) advanced training for experienced auctioneers, (4) and up to 50% discounts on thousands of name brand products. The right section of the webpage contains a light blue box where the user may submit her shipping address. There is a countdown clock on top that ticks off the number of minutes left until the offer expires. Just below is the question "Where do we ship your FREE KIT?" The phrase "FREE KIT" is in red. The button "Ship My Kit!" appears below the spaces for filling in one's name and contact information. Below that is the message inserted in light gray that states "GET YOUR ONLINE AUCTION STARTER KIT TODAY FREE!" The price 19.95 is crossed out and next to it is the offer "NOW FREE! (limited time offer)!" Again, "FREE" is in red. Below the fold,[4] in smaller text, is the following disclaimer: "By submitting this form you are accepting and agreeing to the Privacy Policy and Terms of membership of this Web Site." The phrase "Privacy Policy" and "Terms of Membership" are hyperlinked in slightly darker blue. Further below is the message: "BONUS, your kit includes a FREE 14–DAY TRIAL TO YOUR VERY OWN WEBSTORE." On the bottom left are "Success Stories," which consist of testimonials from two satisfied customers who purchased the kit.

Overall, the predominant message is that consumers can order a free kit on how to make money by selling products on eBay. This is underscored by the repetition and placement of the phrase "Free Kit," which is bolded in red, and by the use of name eBay at the center top of the webpage. Notably, there is no mention of

---

4. The term "fold," originally a newspaper terminology, refers to the bottom edge of a webpage that is viewable on the computer screen without scrolling down. (*See* King, 2/3/12, 130:3–14.)

the product's name "OnlineSupplier," on the webpage in a manner that enables viewers to associate the kit with OnlineSupplier.[5] Nor is there any information about Commerce Planet, its subsidiaries, or any information about cost or the continuity program. Rather, the net impression created by the landing page is that the kit is affiliated with eBay, and that consumers can learn how to sell products on eBay from the kit.

While the terms of the continuity program are disclosed in a separate, hyperlinked "Terms of Membership" page, this is an insufficient cue. Disclaimers do not automatically exonerate deceptive activities. *See FTC v. Gill,* 71 F.Supp.2d 1030, 1044 (C.D.Cal.1999), *aff'd,* 265 F.3d 944 (9th Cir.2001). "A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation contains truthful disclosures." *Cyberspace.com,* 453 F.3d at 1200. There are multiple reasons why the hyperlinked "Terms of Membership" page is inadequate to overcome the net impression that OnlineSupplier was a free auction kit. First, the hyperlink is buried at the bottom and is not placed in close proximity to the "Ship My Kit!" button, making it unlikely that consumers would notice or click on the link. There is also no indication that the "Terms of Membership" are specifically in regard to a negative option plan. Second, when the viewer clicks on the hyperlink, the actual terms of membership appear on a separate pop-up page rather than being directly inserted on the landing page. Such separation suggests that the disclosure is inadequate because it appears in a different context than the claims they purport to repudiate. *See*

*Gill,* 71 F.Supp.2d at 1044 (holding that a disclaimer in contract consumers eventually signed was inadequate to overcome deceptive representations in defendants' advertisements). Third, the information about the continuity plan, contained under numeral 4 ("Payment of Fees"), is buried with other densely packed information and legalese, which makes it unlikely that the average consumer will wade through the material and understand that she is signing up for a negative option plan.

Once the consumer clicks the "Ship My Kit!" button, she is taken to the billing page. (Exhs. 1270–2.) The eBay logo, along with the message "AS SEEN ON TV," is repeated on top, reinforcing the message that the kit is affiliated with eBay. The space for filling in one's payment information is inserted in a light blue vertical box to the right. At the top are two shipping options, regular shipping for $1.95 and expedited shipping for $7.95. Below the space for the credit card information is the "Ship My Kit!" button. At the very bottom, below the fold, in slightly darker blue font and in fine print is the disclosure regarding the negative option plan and payment terms. Although information about OnlineSupplier's negative option plan is disclosed on the webpage, fine-print disclosures may not overcome the net impression of a deceptive representation. *Cyberspace.com,* 453 F.3d at 1200–1201 (finding that disclosures in small-print on the back of a check regarding the monthly fee for internet access was insufficient to defeat the net impression that the check was a refund or rebate); *see also FTC v. Brown & Williamson Tobacco Corp.,* 778 F.2d 35, 42–43 (D.C.Cir.1985) (holding that

---

**5.** The name OnlineSupplier appears only later on the billing page, (Exh. 1270–2), with the message, "Charges will appear as Online Supplier," which is placed under the "Ship My Kit!" button. The Court finds this insufficient to overcome the overwhelming impression that the kit is associated with eBay, as the eBay name figures prominently throughout the payment, billing, upsell, and confirmation pages.

a cigarette advertisement of tar content was deceptive despite a truthful, fine-print explanation in corner of advertisement of how tar was measured). As placed, the disclosure regarding OnlineSupplier's negative option plan is difficult to read because it is printed in the smallest text size on the page and in blue font against a slightly lighter blue background at the very end of the disclosure. The disclosure is also not placed in close proximity to the "Ship My Kit!" button and placed below the fold. It is highly probable that a reasonable consumer using this billing page would not scroll to the bottom and would simply consummate the transaction by clicking the "Ship My Kit!" button, as the consumer is urged to do by the message at the top left: "You are ONE CLICK AWAY from receiving the most up-to-date information for making money on ebay!" Furthermore, the term "negative option" is not clearly defined in the disclosure. The disclosure also states that the consumer "may" be liable for payment of future goods and services if she fails to cancel the service, which casts ambiguity as to whether the consumer will in fact be charged a monthly fee. *See Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir.1989) ("Disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings.")

After the consumer clicks on the "Ship My Kit!" button on the payment page, she is next taken to the upsell page where various products and services are advertised. (Exh. 1270–3.) The product offers are pre-clicked to "Yes," and the consumer must change it to "No" to decline the offer. Each of the products and services involves a free trial offer and a monthly or annual

membership fee. Again, there is no clarification that the kit is a negative option plan. Instead, the top banner states "Come Work Online Using Ebay!" and "Join Over 724,000 Americans . . . Making a Living on Ebay!," which reinforces the central message of using the kit to make money on eBay. If the consumer clicks on the submit button, she is taken to the final confirmation page. (Exh. 1270–4.) That page contains the same message and graphics as the previous upsell page and states that the order has been completed. Even assuming that the upsell and confirmation pages included clarifying information about OnlineSupplier's negative option plan, it is not enough because the transaction would have been completed upon submitting the "Ship My Kit!" button on the billing page. *See Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir.) ("The Federal Trade Act is violated if [an advertisement] induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract."), *cert. denied*, 423 U.S. 827, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975).

## 2. Version II Is Facially Misleading

The sign-up pages of Version II are similarly misleading because they create the net impression that consumers are getting a free kit to sell products on eBay. The landing and billing pages of Version II are largely similar to those of Version I. (Exh. 1271.) On the landing page, the phrase "AS SEEN ON TV" and the eBay logo have been removed, although the word eBay (in red) is still included in the header, and there is a reference to a CBS news story regarding people making a living on eBay. (Exh. 1271–1.) The figure $3.2 billion is now increased to $52 billion. The phrase "GET YOUR KIT NOW FOR FREE" in Version I has been changed to "GET YOUR KIT NOW." (Exh. 1271–1.) The phrase "Just Pay S/H" has also been

added next to the phrase "Free," and the trial period has been shortened from 14 to 7 days. These modifications, however, do not substantively change the net impression that consumers can order a free kit on how to sell products on eBay with payment of shipping. Again, there is no information about OnlineSupplier, Commerce Planet, or the negative option plan.[6] As in Version I, the landing page on Version II includes a hyperlink to "Terms of Membership," which pop up on a separate page. The terms and conditions page now includes information regarding the negative option plan at the very top instead of further down in the text. However, the disclosure is still inadequate for the same the reasons discussed above: the hyperlink is not placed in close proximity to the "Ship My Kit!" button; it is placed below the fold; there are no cues that the terms of membership are specifically in regard to the negative option plan; and the terms and conditions appear on a separate pop-up page.

The most significant change appears on the billing page of Version II. (Exh. 1271–2.) The name eBay has been removed altogether from the top, and "onlinesupplier.com" has been added on the right. Second, the disclosure text has been taken out of the right blue box, centered at the bottom, and written in black font. As the defense team pointed out during trial, the shipping and handling fee, along with the monthly fee, is now in red while the remaining text is in black. Although these modifications do somewhat improve readability, the Court finds that they are inadequate to change the net impression of the landing and billing pages. As in Version I, the disclosure is not placed in close prox-

imity to the "Ship My Kit!" button, but placed at the very bottom of the page, below the fold, so that a reasonable consumer is not likely to scroll to the bottom and see or read it. Furthermore, the main information about the negative option plan is in the smallest text size on the page and densely packed with the other text, rendering it difficult to read.

The remaining pages in Version II follow the same flow as the pages in Version I. When the consumer clicks the "Ship My Kit!" button, she is taken to the upsell page. (Exh. 1271–3.) Here, the eBay logo has been removed, and "onlinesupplier.com" has been added to the header. Version II contains an increased number of upsell offers, which, again, have been pre-clicked to "Yes." Clicking the submit button takes the consumer to the final confirmation page. (Exh. 1271–4.) This page also has "onlinesupplier.com" in the header. The final confirmation page includes some additional information regarding a 7–day trial membership for $1.95, when the consumer will receive the product, customer service information, and OnlineSupplier's website address. It also contains a link to the terms and conditions. But the added information does not change the net impression of OnlineSupplier, as the transaction would already have been completed upon clicking the "Ship My Kit!" button on the billing page. *See Resort Car Rental Sys., Inc.*, 518 F.2d at 964.

In short, the sign-up pages of Version I and II are misleading because the overall, net impression from the content, layout, and design of the webpages is that consumers are ordering a free kit on how to sell goods on eBay with payment of a small shipping and handling fee, not that they

---

**6.** The term "onlinesupplier.com" appears on the billing, upsell, and confirmation pages. However, it is not sufficiently prominent or associated with the kit to the extent that it is

likely to overcome the impression that the kit is affiliated with eBay, which appears on the first landing page.

are subscribing to a negative option plan. It is also apparent that the disclosure—by its placement, wording, colorization, spacing, and size of the text—was designed not be clear and conspicuous, but rather to mask information about OnlineSupplier's continuity program without entirely omitting the information. Such a method of disclosure is inadequate because it simultaneously conceals, obscures, and suppresses the very information it purports to convey. This misrepresentation is undoubtedly material because the information about a free kit goes to the cost of the product, an important factor in a consumer's decision on whether or not to purchase a product. *See Cyberspace.com*, 453 F.3d at 1200. The notion that consumers will get a free kit makes it more likely that they will unwittingly provide their credit card information, thinking they are only paying for shipping and handling, when in fact, they are obligating themselves to pay a subscription fee for the continuity program.

### 3. Expert Testimony

Although a facial examination of the sign-up pages sufficiently demonstrates that the website marketing of OnlineSupplier was misleading to a reasonable consumer, the Court may consider extrinsic evidence as corroborating evidence. *See Kraft, Inc. v. FTC*, 970 F.2d 311, 318–19 (7th Cir.1992). The FTC presented additional evidence that corroborates the Court's conclusion that OnlineSupplier is facially misleading. In particular, the Court finds the expert testimony of Jennifer King to be on-point and persuasive. Ms. King is a researcher and a third-year Ph.D. candidate at the U.C. Berkeley School of Information, with a master's degree in information management and systems, a program that focuses on grad-

uating professionals in Human Computer Interaction ("HCI"). (King, 2/3/12, 101:7–8, 107:2–9, 109:22–110:3.) At Berkeley, Ms. King studies privacy using HCI-based methods, which is the study of how humans interact with computers. (*Id.* at 101:9–18.) HCI research is an interdisciplinary study that encompasses both qualitative and quantitative methods and draws upon such fields as computer science, cognitive psychology, and social psychology, among others. (*Id.* at 103:14–17, 104:22–105:9.)

Ms. King was retained by the FTC to review OnlineSupplier's webpages and determine whether (1) customers would understand that a negative option was present when they reviewed the sign-up pages, and (2) after they finished the check-out process, whether they would understand that they were enrolled in a continuity program. (*Id.* at 113:2–10.) Here, Ms. King applied a usability inspection method, a type of HCI qualitative-based approach that is "user-centered"—meaning that it focuses on what the user can perceive and what the user should do. (*Id.* at 103:23–104:1, 115:23–116:10.) Ms. King likened the method to a preflight checklist whereby she analyzes the webpages to see if they are consistent with certain HCI heuristics or principles of usability. (*Id.* at 114:22–115:15; 116:16–117:4.) Thus, like an airline pilot who goes through a preflight checklist trying to determine if the plane should fly, an expert conducting a usability inspection looks for major flaws in a website to determine whether it should be launched. (*Id.*) [7] After inspecting Version I and Version II, Ms. King concluded that she did not believe that "most people" would know, after visiting the webpages, that a negative option exist-

---

**7.** In light of Ms. King's education and experience in the field of HCI, the Court finds her well-qualified to conduct and testify on a usa-

bility inspection of OnlineSupplier's webpages.

ed or that "most people" would know they were enrolled in a continuity program upon completing the check-out process. (*Id.* at 114:9–18.)

#### (i) Version I

With respect to Version I, Ms. King focused on what consumers are drawn to based on principles of usability. These principles include the fact that users typically do not scroll, tend to scan very quickly and read only 20% of what is on the page, and seek cues for what to do next on a webpage. (*Id.* at 123:19–125:6, 125:20–23.) Ms. King testified that on the landing page of Version I, the things that draw the most attention are the "AS SEEN ON TV" logo, the eBay logo, and the word "kit" used multiple times. (*Id.* at 124:7–11.) The primary call to action on the landing page is the "Ship My Kit!" button. (*Id.* at 124:13–18, 124:23.) On the billing page, the primary call to action is filling out the payment information and the "Ship My Kit!" button. (*Id.* at 127:6–18.) Ms. King testified that there is nothing on the screen to cause a typical consumer to believe that they would be signing up for a free trial and would incur monthly charges on their credit card. (*Id.* at 127:21–25.) As to the hyperlinked "Terms of Membership," Ms. King testified that she had grave concerns with the pop-up window, as a lot of factors could potentially interfere with viewing that window, such as a pop-up blocking software installed on the computer or other windows on the screen. (*Id.* at 135:12–136:4.) Ms. King also pointed out that the terms and conditions contain at least 6,000 words in giant blocks of text; the disclosure about the membership fee is buried in section 4; and the terms and conditions are written in legal language, which most people do not understand and immediately ignore. (*Id.* at 137:2–17, 138:4–9.) Ms. King testified that the "Terms of Membership" hyperlink and the adjacent "Privacy Policy" hyperlink are also terms that most people are trained to immediately tune out. (*Id.* at 136:5–19, 136:20–137:1.)

Ms. King further identified several key flaws with regard to the disclosure. First, Ms. King provided screenshots of the landing and billing pages, which showed that the disclosure appeared below the fold, as seen on a computer screen with the resolution size of 1024 by 768 pixels (the most common resolution for computers during the time the webpages were live from 2005 and 2006) and allowing for the maximum amount of screen space. (*Id.* at 131:3–132:25, 133:1–4, 133:20–134:25; Exhs. 1324, 1325.) Ms. King explained that the placement of the disclosure below the fold violates the cardinal heuristic of usability because people do not read the entire webpage and do not tend to scroll down to look for information below the fold. (King, 2/3/12, 128:1–7, 130:5–16, 133:5–9.) Generally, what one wants people to read the least is placed at the bottom while the thing one cares about the most is placed at the top of the webpage and above the fold. (*Id.* at 128:8–12.)

In rebuttal, Gugliuzza provided evidence of a screenshot from his computer showing the disclosure on the billing page of Version I to be above the fold. (Exh. 19; *see also* Exh.2002.) But the net impression test under section 5(a) is from the perspective of a *reasonable consumer*, not that of the seller or the seller's employee. While Gugliuzza's computer may, indeed, have shown a part of the billing page disclosure to be above the fold, it is not representative of the resolution size of the typical consumer. Ms. King testified that the most common resolution size at the time Version I was live was 1024 by 768 pixels. (King, 2/3/12, 126:16–21.) Ethan Brooks, the company's Chief Technology Officer from 2006 to 2007, also confirmed that

during the time that OnlineSupplier's sign-up pages were live, the screen resolution was 1024 by 768 for approximately 50% of users, which would place the disclosure below the fold. (Brooks, 2/9/12, 100:16–101:2, 102:7–12, 113:23–114:9, 115:20–22, 116:14–21.) The defense team also pointed to hints of something more below the fold—*i.e.*, the light blue box continues downward and the graphic on the left is cut off. However, Ms. King testified that these were ineffective visual cues considering the totality of the page and the prominence of the "Ship My Kit!" button. (King, 2/7/12, 29:12–31:5; Exh. 1323.) Even assuming the disclosure were entirely above the fold for most consumers, the Court finds that its visibility is only slightly improved given its overall placement and presentation on the page.

A second flaw Ms. King observed was that the disclosure is located far away from the "Ship My Kit!" button, at the very bottom of the page, and after the hyperlinked terms of membership and "Privacy Policy." (King, 2/3/12, 128:18–22.) Ms. King testified that her research in user cognition and privacy policies demonstrates that "as soon as you put the word 'privacy policy' in front of a consumer, they completely tune out. They're one of the most unread components of a web page." (*Id.* at 128:23–129:6.) Thus, "the location of the disclosure after that privacy policy link basically signals to somebody that here is something you don't need to read; this is not relevant to your shopping experience. If it were crucial, it would have been placed up near the 'ship my kit' button." (*Id.* at 129:7–13.) Third, Ms. King testified that the visibility of the disclosure was poor given the blue-on-blue lettering, the small and blocky text, the all-cap font (rendering it more difficult, not easier to read), and the legalese language (most people are not familiar with the term "negative option"). (*Id.* at 128:13–17, 129:21–130:2.)

Ms. King concluded that Version I did not appear to be offering for sale a membership program because (i) that messaging was absent from the entire user flow and the focus of the pages was instead on obtaining a free kit, and (ii) there was no mention of the continuity program in the area of the webpage where she believed most people would spend their viewing time. (*Id.* at 139:11–21.) Ms. King stated that she would not recommend launching Version I until the core flaws she identified were fixed. (*Id.* at 139:22–140:4.)

### (ii) Version II

With regard to Version II, Ms. King similarly opined that the landing and billing pages did not contain anything that would cause a typical consumer to believe she would be signing up for a free trial in OnlineSupplier and would incur monthly charges until she affirmatively cancelled. (*Id.* at 141:5–9, 142:2–6.) The primary message of Version II's landing page is consistent with that of Version I—the focus is on the words eBay, starter kit, and free online auction. (*Id.* at 140:5–24.) The billing page does include the word OnlineSupplier for the first time, but the call to action remains "Ship My Kit!" (*Id.* at 141:15–142:1.) As to the disclosure on the billing page, Ms. King acknowledged that some changes were made to improve visibility, but that they were inadequate because "key flaws" were not addressed—*i.e.*, the disclosure is still ensconced in a very large block of small text, printed in caps, dressed in legal language, placed at the bottom of the page away from the primary call to action ("Ship My Kit!"), and appears below the fold. (*Id.* at 142:7–25, 152:23–154:2.) Ms. King testified that because most major webpages tend to always put their legal disclosures in the footer, "people have been trained to know

if you see 'terms and conditions,' privacy policy,' . . . they are things that they do not need to read to complete the task at hand." (*Id.* at 143:7–18.) As with Version I, Ms. King provided a screenshot of the landing and billing pages of Version II, using the same resolution (1024 by 768 pixels) and maximizing the display windows. (Exhs. 1323, 1326.) Neither of the screenshots shows the terms and conditions hyperlink or the disclosure to be above the fold, and Ms. King testified that most consumers would not have seen the disclosures on the billing page. (King, 2/3/12, 144:3–25, 147:9–148:7.) As in Version, I, Ms. King testified that the terms and conditions are unhelpful in disclosing the materials terms of OnlineSupplier because they are only available by clicking the hyperlinked "Privacy Policy" and "Terms and Condition"—two terms that people do not tend to view. (*Id.* at 149:12–18.) The terms of membership for OnlineSupplier are also ineffective because— although the terms of the negative option plan appear at the very beginning of the 6,000–word text—the disclosure is contained in a separate pop-up window rather than directly on the billing page. (*Id.* at 148:13–149:1, 149:24–150:12.) Ms. King concluded that Version II does not appear to be offering for a sale a membership program and that she would not have recommended launching Version II because of "severe violations of usability rules that need to be addressed." (*Id.* at 152:14–22.)

### (iii) Rebuttal Testimony

Mr. Gugliuzza did not produce any expert rebutting Ms. King's usability inspection of OnlineSupplier's webpages. Rather, Mr. Gugliuzza attempted to minimize Ms. King's testimony by pointing out that she did not incorporate any analysis of empirical data in reaching her conclusions. (Def.'s Closing Brief, at 44.) For example, Mr. Gugliuzza relies on evidence that ap-proximately 45% of the consumers who purchased OnlineSupplier cancelled within the free trial period, (Exh. 31), and that there were thousands of websites created between January 2005 and March 2007 using OnlineSupplier, (*see* Cruttenden, 2/28/12, 8:18–10:9, 12:6–8, 60:23–61:7; Exh. 2057). Mr. Gugliuzza's criticism misses the mark. There was no explanation of how an empirical analysis is relevant to a usability inspection, which focuses on what the user can perceive and do on a webpage given certain HCI principles of usability. Ms. King explained why she conducted a usability inspection, as opposed to other methods (such as a focus group), given the scope of the project and the size of OnlineSupplier's website. (*See* King, 2/3/12, 117:12–24.) The Court finds that a usability inspection, with its emphasis on user perception and comprehension of the information presented to them on a webpage, is consonant with a "net impression" test under section 5(a) of the FTC Act, which turns on a facial examination of the relevant marketing materials.

Mr. Gugliuzza further argued that a close analysis of user data reveals that the "vast majority" of consumers signed up for OnlineSupplier knowing the terms of the negative option plan. (Def.'s Closing Brief, at 39–40.) Mr. Gugliuzza's reliance on user data is misguided and uncorroborated by the evidence in the record. Mr. Gugliuzza introduced the testimony of its accounting expert, Dr. Stefano Vranca, who submitted a rebuttal report to the consumer injury calculation of Dr. Daniel Becker, the FTC's consumer injury expert. Dr. Vranca testified that for the period from 2005 to April 2008, using the company's Microsoft Access Realtime (RT3) database, 46.32% of those who ordered OnlineSupplier cancelled within the free trial period. (Vranca, 2/28/12, 74:3–76:5; Exh. 2061.) Dr. Vranca further testified that nearly 20% of OnlineSupplier subscribers

maintained their membership for more than three months and 10% of subscribers maintained their membership in excess of six months. (Vranca, 2/28/12, 84:3–22; Exhs. 2062–63.) Dr. Vranca's calculation, however, does not entirely support Mr. Gugliuzza's conclusion. As Dr. Becker pointed out, Dr. Vranca neither discussed the specific steps used to arrive at his calculation nor explained how the RT3 data was used in his rebuttal report. (*See* Becker, 2/15/12, 15:23–18:3.) Using the data from the company's RT3 system, Dr. Becker testified that both he and his assistant independently calculated a cancellation rate of 25%. (*Id.*) Even assuming that upwards of 45% of consumers did cancel within the free trial period, there was no accounting of how consumers knew about the membership terms—*i.e.*, whether they knew from the sign-up pages, from post-transaction communications, or examination of the kit itself. (*See* Vranca, 2/28/12, 104:5–109:1, 109:18–25.) More importantly, Dr. Vranca did not account for the 55% (the majority) of the consumers who did not cancel within the trial period and the 80% to 90% of those who did not subscribe to OnlineSupplier for more than three or six months.

There is also no showing that consumers who remained OnlineSupplier members did so knowing the terms of the membership upon submitting their credit card information. As true of Joan Cirillo, (*see infra* Part III.A.4), consumers simply could not have checked or seen the membership fee on their credit card bill for several months. Mr. Gugliuzza also pointed to the fact that there were thousands of websites created between January 2005 and March 2007 using OnlineSupplier,

(Cruttenden, 2/28/12, 8:18–10:9, 12:6–8, 60:23–61:7; Exh. 2057), and that fourteen consumers—including Eric and Lucia Carter—provided positive testimonials of OnlineSupplier, (Carter, 2/17/12, 28:8–19, 37:24–38:24; Exh. 2004.) But the evidence shows that the Carters and others who submitted positive testimonials did so in early March 2005, and thus likely purchased OnlineSupplier through in-bound telemarketing, not via the sign-up pages, which were not live until July 2005. (*See* Seidel, 2/14/12, 150:20–151:20; Gravitz, 2/2/12, 108:17–109:1; Exh. 2004.)[8] More importantly, the FTC is not required to prove that all consumers were deceived. *Stefanchik,* 559 F.3d at 929; *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 572 (7th Cir.1989) ("[T]he FTC need not prove that every consumer was injured."), *cert. denied,* 493 U.S. 954, 110 S.Ct. 366, 107 L.Ed.2d 352 (1989). Nor does the FTC need to prove that individual reliance of the misrepresentation by each purchasing consumer. *FTC v. Figgie Int'l, Inc.,* 994 F.2d 595, 605–606 (9th Cir.1993), *cert. denied,* 510 U.S. 1110, 114 S.Ct. 1051, 127 L.Ed.2d 373 (1994). It is also not enough that there were a few satisfied customers of OnlineSupplier or that it had some utility. *See FTC v. Tashman,* 318 F.3d 1273, 1278 (11th Cir.2003) (concluding that the district court incorrectly focused on a few satisfied customers and utility of the product being sold, rather than analyzing the misrepresentations made about the product); *Amy Travel Serv., Inc.,* 875 F.2d at 572 ("The existence of some satisfied customers does not constitute a defense under the FTCA."); *accord Stefanchik,* 559 F.3d at 929 n. 12. Finally, as discussed below,

---

8. For example, Mr. Carter, who appeared on an infomercial regarding OnlineSupplier in 2005, testified that he purchased the program in 2004 (before Version I and II were live), that he did not recall if he used the webpages to sign up for the program, and that he was neither charged a shipping fee nor received a kit in the mail. (Carter, 2/17, 6:15–7:4, 33:21–25, 51:22–52:5; Exh. 1334.)

there were numerous complaints of consumer confusion regarding OnlineSupplier's payment terms that undercut Mr. Gugliuzza's argument that, at best, only "an infinitesimally small percentage" of customers ever claimed to be confused by the disclosure of the terms. (Def.'s Closing Brief, at 39–40).

### 4. Consumer Complaints

■ To establish a section 5 violation, proof of actual deception is unnecessary; it only requires a showing that misrepresentations "possess a tendency to deceive." *Trans World Accounts, Inc. v. FTC*, 594 F.2d 212, 214 (9th Cir.1979); *see also Feil v. FTC*, 285 F.2d 879, 896 (9th Cir.1960) (stating that "[a]ctual deception is not necessary" for the FTC to exercise its extensive power to prevent the use of deceptive acts). Although proof of actual deception is not necessary, "such proof is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances." *Cyberspace.com*, 453 F.3d at 1201.

The FTC presented abundant evidence that consumers were actually misled by OnlineSupplier's webpages. Two fairly sophisticated consumers, David Suckling and Joan Cirillo, testified that they were misled by OnlineSupplier's webpages. Mr. Suckling, a former owner of an internet company that built websites for clients, testified that he signed up for OnlineSupplier from a webpage advertising that he could obtain a free information if he just paid for shipping. (Suckling, 1/31/12, 61:6–15, 61:11–16.) His overriding impression was that he was being offered a free information kit on how to make money on eBay. (*Id.* at 62:15–17.) When he ordered the kit by submitting his address and credit card information on the sign-up pages, he did not believe that he was going to be charged anything in addition to the shipping fee. (*Id.* at 61:25–62:8.) Mr. Suck-

ling later discovered he was charged $49.95 when he examined his credit card bill and called customer service to request a full refund. (*Id.* at 65:4–9.) Mr. Suckling received only a partial refund for $24.95. (*Id.* at 65:1–17.) After his call with customer service, he filed a complaint with the BBB. (*Id.* at 65:18–20.) Like Mr. Suckling, Ms. Cirillo, a corporate attorney for ten years, is well-versed in computer usage. She testified that she believed that she was ordering a free kit to learn how to be a seller on eBay, only to discover that she had been charged $49.95 five times, totaling approximately $250, from November 2006 to April 2007. (Cirillo, 1/31/12, 74:3–19, 76:16–19, 82:21–24.) Ms. Cirillo also called customer service to request a refund and filed a complaint with the BBB. (*Id.* at 74:23–75:7, 88:14–22.) Ms. Cirillo did not receive any refund. (*Id.* at 90:2–6.) Mr. Suckling's and Ms. Cirillo's overall impression that they were ordering a free information kit to sell products on eBay are consistent with the Court's overall net impression of OnlineSupplier's webpages and Ms. King's usability inspection of the sign-up pages.

There is also ample evidence that Commerce Planet, through its customer service department CLG, received thousands of telephone complaints regarding OnlineSupplier and requests for refunds. José Guardiola, the customer service manager for CLG, handled customer complaints regarding billing issues on a daily basis, either by personally taking a call or by interacting with customer service representatives on the floor. (Guardiola, 2/21/12, 7:22–8:4, 90:19–23.) The most common type of complaint Mr. Guardiola identified were "free-kit-only" complaints—*i.e.*, people thought they were just paying $1.95 in shipping for a starter kit, only to discover they were being charged a monthly fee. (*Id.* at 8:11–21.) Mr. Guar-

diola estimated that approximately 70% of the consumer complaints consisted of free-kit-only complaints. (*Id.* at 8:22–9.6.) For example, in Mr. Guardiola's weekly reports during July and November 2006 and March 2007, there were a total of 18,000 calls handled by customer service, out of which Mr. Guardiola estimated that between 70% to 80% of the calls related to free-kit-only complaints. (*Id.* at 31:20–32:13; Exhs. 1292a, 1293, 1295.) Mr. Guardiola conservatively estimated that CLG received about a thousand free-kit-only complaints per week and tens of thousands of such complaints during his tenure at Commerce Planet from August 2006 to August 2007. (*Id.*)

In addition to telephone complaints, thousands of written complaints regarding OnlineSupplier were submitted to the BBB, the Attorney General, and Commerce Planet via emails, mail, and website submissions. (Exhs. 163, 193, 1180, 1177–79.) The Court admitted a total of approximately 4,000 complaints consisting of over 500 BBB complaints (Exh. 163); 3,272 archived email complaints to Commerce Planet from July 2005 to March 2008 (Exh. 1180); and over 200 Consumer Sentinel FTC database complaints (Exhs. 1177–79). (Trial Tr., 2/9/12, 97:22–98:7; Exh. 1176 [excluding declaration and categorizations].)[9] A significant number of these related to consumer confusion regarding the nature of the product and its cost. Consumers complained that they thought they had signed up for a free information kit about how to sell products on eBay with payment of shipping, rather than subscribing to a continuity program with a monthly fee. For example, on June 13, 2006, Kenneth Goolsby filed a complaint with the BBB regarding a May 2006 purchase of OnlineSupplier, stating that he "thought [he] was signing up for free ebay info w/ a shipping of $1.95" and never agreed to monthly charges. (Exh. 163–694.) On September 5, 2006, Selena Phillips similarly stated regarding her August 2006 order of OnlineSupplier: "I ordered a 'free' package that was supposed to explain everything online supplier is supposed to do. I was only told to pay the shipping and handling fee of $1.95. Never did they ask me to look over the terms or agreement or have anything checked off that I looked at the terms or agreement." (Exh. 163–719.) Mr. Guardiola identified Mr. Goolsby's and Ms. Phillips' complaints as typical of those he encountered at CLG. (Guardiola, 2/21/12, 9:9–10:14.) On April 26, 2007, Joanna Gaul submitted a complaint to the Attorney General regarding her purchase of OnlineSupplier on January 31, 2007, stating that she "did not authorize them [Commerce Planet] to charge my card for anything but the $1.95 ... I ordered a How To Use E–Bay book online for $1.95," but "[w]hen I received the information I discovered it wasn't about using E-bay it was about having an on line business ... when I received my credit card bill I had been charged $49.95. I called and told them I did not authorize this charge...." (Exh. 193.) On April 25,

---

**9.** With regard to the archived emails, (Exh. 1180), the Court admitted them as proper summaries under Federal Rule of Evidence 1006. The Court noted that the complaints were not being offered for the truth of the matter asserted, but as evidence of the consumer's confused state of mind. (Trial Tr., 2/8/12, 133:17–135:2.) All the BBB, email, Attorney General, and Consumer Sentinel complaints—totaling 4,057 complaints from 2004 to 2009—were classified in the FTC's March 2011 Project. (Gale, 2/8/12, 99:16–100:3, 112:25–114:23.) In that classification project, FTC investigator Bruce Gale and his litigation team (consisting of six law students and one other FTC investigator) classified all the complaints into eight categories. The Court excluded the classifications as improper expert opinion. (Trial Tr., 2/9/12, 89:3–90:7, 94:17–22, 97:22–98:7.)

2006, Ian Bennett sent the following email complaint to Commerce Planet regarding the lack of clear disclosure for the continuity program: "This is notice for you to refund the $29.95 you billed me [I did not authorize it] and to inform you that your method of securing payment for shipping of free kit did not CLEARLY show the fact that a letter would have to be generated to cancel any further obligations.... The following web page [for OnlineSupplier] does not show the required verbiage except below the fold of the displayed page which would not be read by most people.... Your manner of advertising is deceptive and misleading and you should take immediate steps to CLEARLY indicate during the initial offer that after 14 days an automatic billing of 29.95 would occur." (Exh. 1180.) Another consumer sent a similar email complaint on August 18, 2006: "Your business practice [is] extremely misleading and border on fraud.... There is nothing what so ever on the sign up page or the terms of membership that in fact state that requesting the 'free' startup kit is in fact the same thing as account activation and/or account registration. NOTHING." (*Id.*) The Court finds the testimony of Mr. Suckling, Ms. Cirillo, and Mr. Guardiola as well as the evidence of consumer complaints credible and highly probative evidence that the website marketing of OnlineSupplier was misleading and deceptive.

### 5. Excessive Chargeback Rates

The FTC presented additional evidence of excessive chargeback rates for OnlineSupplier during the relevant time period, which corroborates the Court's finding that the program's sign-up pages were misleading. A "chargeback" consists of a returned sales transaction from the issuing bank to the acquiring bank sponsoring a particular merchant into the credit card payment system. (Chen, 2/2/12, 133:22–

134:11, 135:7–11.) When a chargeback occurs, the funds associated with that transaction flow back to the issuer bank. (*Id.* at 135:12–16.) The average chargeback rate in the United States is 0.2% of the transaction rate. (*Id.* at 136:22–137:13.) Visa Credit Cards, one of the credit cards accepted for purchasing OnlineSupplier, identifies merchants who exceed a chargeback rate of about 1% in any given month. (*Id.* at 138:8–22, 140:18–141:4.)

Visa's business records show that OnlineSupplier was enrolled in Visa's Merchant Chargeback Monitoring Program ("MCMP") starting in 2004. (Exh. 1057.) OnlineSupplier continued to be in Visa's MCMP when the webpages of Version I and Version II were live during Mr. Gugliuzza's tenure at Commerce Planet. (Exhs. 1058–62.) OnlineSupplier was also part of Visa's Global Merchant Chargeback Monitoring Program ("GMCMP") in 2007. (Exhs. 1064–65.) From February 2006 to July 2007, OnlineSupplier exceeded Visa's 1% chargeback threshold for most months, reaching peaks of 5% in June 2006 and April through May 2007, 7% in June 2007, and 8% in July 2007 with certain acquiring banks. (Exh. 1312; *see also* Exhs. 1058–62; Exhs. 1317–19, 1321–22.) Commerce Planet incurred substantial fees in connection with OnlineSupplier chargebacks, totaling more than one million dollars between February 2006 and July 2007. (Seidel, 2/14/12, 74:24–75:20; Chen, 2/3/12, 5:9–23; Exhs. 1126, 1162, 1317, 1320.) From February 2006 to July 2007, Andrew Chen, who works at Visa's management division and is responsible for monitoring merchants with excessive chargebacks, testified that Visa monitored OnlineSupplier in all four of its risk management programs: (1) the MCMP, (2) the GMCMP, (3) the Risk Identification Service Online ("RIS"), and (4) the Merchant Fraud Performance Program. (Chen, 2/3/12, 131:3–12.) Mr. Chen opined that OnlineSuppli-

er's performance in those programs was poor, given the extended time period during which OnlineSupplier was part of the programs and the fact that its chargeback problems never abated, among other factors. (Chen, 2/2/12, 131:13–132:7.) Mr. Chen testified that based on his research into case logs of merchants in Visa's monitoring programs, OnlineSupplier was the only merchant that had been in all four monitoring programs. (*Id.* at 132:2–7.) Officers and employees at Commerce Planet, including Messrs. Gugliuzza, Hill, and Gravitz, all averred that OnlineSupplier's chargeback rate was a problem throughout their tenure at the company. (Gravitz, 2/1/12, 60:11–12, 60:24–61:2, 78:1–3; Gugliuzza, 2/22/12, 55:25–56:23, 60:4–6, 104:9–17; Daniel, 2/14/12, 19:9–19, 20:17–20, 24:6–9, 24:20–25:3, 26:8–11; Hill, 2/7/12, 156:13–157:3; Foucar, 2/16/12, 134:17–135:22, 160:6–9; Exh. 40.) The chargeback problem for OnlineSupplier was never resolved. (Gravitz, 2/1/12, 134:10–15.)

Mr. Chen testified that the frequent source of OnlineSupplier's excessive chargeback rates was e-commerce fraud, meaning that "consumers didn't recognize the transactions." (Chen, 2/3/12, 26:7–24.) Commerce Planet's chargeback reductions plans identify inadequate disclosure of OnlineSupplier's billing terms in their advertisement as one source of the company's chargeback problem. (*Id.* at 28:17–30:18; Exhs. 1076–77, 40.) Although Visa did not specifically link OnlineSupplier's excessive chargeback rates to deceptive website marketing during its monitoring of OnlineSupplier, Mr. Chen testified that Visa was just beginning to witness e-commerce deceptive marketing from 2004 to 2007 so that Visa did not know how to exactly identify that kind of problem until a few years later. (Chen, 2/3/12, 28:3–14.) In 2008 and 2009, Visa identified certain features employed by continuity merchants, such as use of a free trial offer, a pay-for-shipping model, and a negative option plan, as being potentially deceptive marketing tactics. (*Id.* at 2/2/12, 156:21–157:21.) All these characteristics were marketing features of OnlineSupplier. The Court finds OnlineSupplier's history of excessive chargeback rates to be consistent with deceptive website marketing.

### 6. Third–Party Marketers

Mr. Gugliuzza does not dispute that at least some consumers were confused and misled into signing up for OnlineSupplier or that Commerce Planet had high chargeback rates resulting from consumers requesting that their credit card company rescind the charges on their purchase. Rather, Mr. Gugliuzza heavily relies on the defense that consumer confusion and high chargeback rates were the result of third-party affiliate marketers [10] who engaged in affiliate fraud that induced consumers to sign-up for OnlineSupplier under false pretenses. In opening statements, the defense team pinned blame on third-party marketers, who they argued violated the terms of the marketing agreement with Commerce Planet by employing such tactics as using unapproved email notifications, false promises of free gifts upon signing up for OnlineSupplier (incentivized marketing), and use of stolen credit card information and prepaid credit cards. (Trial Tr. 1/31/12, 22:18–23:3, 46:14–18.) The defense argued that once Mr. Gugliuzza discovered that affiliate fraud was occurring, he took aggressive steps to combat the problem, and that at the end of his tenure at Commerce Planet, it was mostly resolved. (*Id.* at 23:4–8.)

10. Affiliate marketers are publishers who generate consumer interest in the product through use of opt-in emails or advertising. (Gravitz, 2/1/12, 12:14–18.)

The Court does not find this defense to be convincing in light of the totality of evidence presented. First, there is insufficient evidence in the record that establishes that affiliate fraud was primarily responsible for consumer confusion about OnlineSupplier. Commerce Planet began to use affiliate marketers around September 2005 under various payment arrangements. (Hill, 2/17/12, 97:23–98:4.) [11] Mr. Hill testified that Commerce Planet was subject to certain third-party marketing fraud, including unapproved pages and email creatives to drive traffic, click fraud, and stolen credit cards. (*See id.* at 98:15–99:9, 100:22–102:3.) Around November 2006, Commerce Planet was also subject to incentivized marketing traffic—*i.e.*, offers for free gifts for signing up for OnlineSupplier. (Brooks, 2/9/12, 140:23–141:18; Gravitz, 2/1/12, 120:10–24; Exh. 40–1175) Mr. Hill testified that Mr. Gugliuzza vigorously countered the problem through non-issuance of payment, cancellation of contracts, and filing lawsuits. (Hill, 2/17/12, 102:4–103:5.) However, aside from testimony that affiliate fraud occurred, there was no specific evidence linking affiliate fraud as the primary cause of consumer confusion and high chargeback rates. There was also no documentation that specific third-party marketers employed certain types of affiliate fraud. While third-party marketers may have increased traffic to the sign-up pages by, for example, use of unapproved email creatives, consumers still had to view and utilize the sign-up pages to order OnlineSupplier. (*See* Hill, 2/17/12, 137:17–138:9.) Any confusion caused by the email creative would have been countered by representations about the product on the landing and billing pages. There is no evidence in the record that consumers ordered OnlineSupplier directly from third-party marketing materials or that third-party marketers were responsible for the sign-up pages. While affiliate fraud undoubtedly hurt Commerce Planet, it is unclear if it hurt consumers. (*See* Hill, 2/17/12, 136:12–20.) For example, in the case of contractual fraud (such as use of a prepaid debit card or click fraud),[12] Commerce Planet bore the cost, but consumers were unaffected. (*Id.* at 137:11–16.) Furthermore, the evidence shows that OnlineSupplier was consistently subject to high chargeback rates and was enrolled in Visa's MCMP in 2004, before third-party marketers were used. Excessive chargeback rates also predated incentivized marketing traffic, which began in November 2006. (*See* Brooks, 2/9/12, 140:23–142:2; Gravitz, 2/1/12, 120:22–24; Exh. 40.) Mr. Chen testified that affiliate fraud would not have been the sole driver of all the fraud and chargeback issues, particularly once merchants started to shut down those affiliate relationships. (Chen, 2/3/12, 94:10–17.) With respect to OnlineSupplier's ten-month history in the MCMP, Mr. Chen testified that affiliate fraud would not typically have been the driving factor for that time period. (*Id.* at 94:18–25.) Mr. Gravitz testified that the chargeback problem for OnlineSupplier was never resolved. (Gravitz, 2/1/12, 134:10–15.) The evidence taken as a whole does not support Mr. Gugliuzza's affiliate fraud story.

**11.** These arrangements included cost-per-click advertising in which Commerce Planet would pay the third-party marketer every time someone clicked on the marketer's ad; cost-per-thousand advertising when the company pays based on the number of impressions that the ad shows or number of emails that are sent; and cost-per-acquisition marketing that compensated the third-party marketer based on actual placement of an order. (Gravitz, 2/1/12; 13:5–20.)

**12.** Click fraud occurs when third-party marketers simulate consumer traffic by a bot or a computer.

In short, the FTC has provided a plethora of evidence that OnlineSupplier's sign-up pages were misleading because they conveyed the net impression that consumers could order a free auction kit with payment of a small shipping and handling fee, when in fact, they were subscribing to a negative option plan. The expert testimony of Ms. King, along with numerous free-kit-only complaints and excessive chargeback rates, provide strong corroborating evidence that the website marketing of OnlineSupplier was misleading and deceptive.

### B. Unfair Acts (Count II)

■ The FTC has provided sufficient evidence that Commerce Planet's website marketing of OnlineSupplier was also unfair under section 5(a). An act is unfair if it (1) causes substantial injury (2) not outweighed by countervailing benefits to consumers or competition, and (3) one that consumers themselves could not reasonably have avoided. 15 U.S.C. § 45(n); *see also FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir.2010); *FTC v. J.K. Publ'ns, Inc.*, 99 F.Supp.2d 1176, 1201 (C.D.Cal. 2000).

#### 1. Substantial Injury

■ The substantial injury prong is satisfied if the FTC offers sufficient evidence that consumers "were injured by a practice for which they did not bargain." *Neovi*, 604 F.3d at 1157 (citation and quotes omitted); *accord J.K. Publications*, 99 F.Supp.2d at 1201. "An act or practice can cause substantial injury by doing a small harm to a large number of people, or if it raises a significant risk of concrete harm." *Neovi*, 604 F.3d at 1157–58 (citation and quotes omitted). "Both the Commission and the courts have recognized that consumer injury is substantial when it is the aggregate of many small individual injuries." *Pantron I Corp.*, 33 F.3d at 1102; *see also Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1365 (11th Cir.1988) ("As the Commission noted, although the actual injury to individual customers may be small on an annual basis, this does not mean that such injury is not 'substantial.'"), *cert. denied*, 488 U.S. 1041, 109 S.Ct. 865, 102 L.Ed.2d 989 (1989). Here, the evidence shows that thousands of consumers were misled into signing up for OnlineSupplier, thinking that they were ordering a free auction kit, instead of a continuity program with an automatic monthly charge to their credit card. Although the precise dollar amount of injury cannot be calculated here, there were thousands of consumers who were misled into signing up for OnlineSupplier and incurred monthly charges ranging from $29.95 to $59.95. The FTC approximated the total amount of consumer injury to be at least $18.2 million, which the Court finds reasonable and substantial. (*See infra* Part IV.B.)

#### 2. Countervailing Benefits

■ "The second prong of the test is easily satisfied when a practice produces clear adverse consequences for consumers that are not accompanied by an increase in services or benefits to consumers or by benefits to competition." *J.K. Publications*, 99 F.Supp.2d at 1201 (citations and quotes omitted). This prong is satisfied here because consumers who were misled into ordering OnlineSupplier would not have known that they had subscribed to a web hosting program; hence, they would not have utilized its product and services. Consumers also did not give their consent to enrollment in OnlineSupplier, and thus, the harm resulted from a practice for which they did not bargain. *Neovi*, 604 F.3d at 1157. Although there is evidence that some consumers did in fact set up webstores and were satisfied with OnlineS-

upplier, it is not enough that there were a few satisfied customers of OnlineSupplier or that it had some utility. *See Tashman*, 318 F.3d at 1278; *Amy Travel Serv., Inc.*, 875 F.2d at 572; *Stefanchik*, 559 F.3d at 929 n. 12.[13]

### 3. Not Reasonably Avoidable

 "In determining whether consumers' injuries were reasonably avoidable, courts look to whether the consumers had a free and informed choice." *Neovi*, 604 F.3d at 1158. As discussed above, OnlineSupplier's landing and billing pages created the net impression that consumers could order a free kit to learn how to sell products online. They were not adequately informed that they were signing up for a continuity program with monthly charges. Ms. King testified that most consumers would have been confused by the sign-up pages. Most consumers thus could not have reasonably avoided the monthly charge. Accordingly, the website marketing of OnlineSupplier constituted unfair practice in violation of section 5(a).

### C. Individual Liability

 An individual may be held liable for corporate violations of the FTC Act if the individual (1) participated directly in the wrongful practice or act or had authority to control it, (2) had knowledge of the wrongful practice or act, was recklessly indifferent to the truth or falsity of the misrepresentation, or was aware of a high probability of fraud along with an intentional avoidance of the truth. *Stefanchik*, 559 F.3d at 931; *FTC v. Garvey*, 383 F.3d 891, 900 (9th Cir.2004); *Amy Travel Serv.*, 875 F.2d at 573. If the FTC proves direct participation in or authority to control the wrongful act, then the individual may be

permanently enjoined from engaging in acts that violate the FTC Act. *Garvey*, 383 F.3d at 900. To hold an individual liable for monetary redress, the FTC must additionally establish knowledge. *FTC v. Affordable Media*, 179 F.3d 1228, 1234 (9th Cir.1999); *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir.1997). Proof that the defendant intended to deceive consumers or acted in bad faith is unnecessary to establish a section 5(a) violation. *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir.1988) ("An advertiser's good faith does not immunize it from responsibility for its misrepresentations." (citation and quotes omitted)); *Feil*, 285 F.2d at 896 ("Whether good or bad faith exists is not material, if the Commission finds that there is likelihood to deceive.")

### 1. Participation and Authority to Control

 Authority to control may be evidenced by "active involvement in business affairs and making of corporate policy, including assuming the duties of a corporate officer." *Amy Travel Serv.*, 875 F.2d at 573. An individual's position as a corporate officer and/or authority to sign documents on behalf of the corporate defendant is sufficient to show requisite control. *See Publishing Clearing House*, 104 F.3d at 1170 (holding that individual's "assumption of the role of president of [the corporation] and her authority to sign documents on behalf of the corporation demonstrate that she had the requisite control over the corporation" for purposes of finding individual liability under section 5(a)); *J.K. Publications*, 99 F.Supp.2d at 1181–82 (holding a consultant liable because he had "ownership in and/or control over" the company).

---

**13.** It is also doubtful whether any of the satisfied customers—including the fourteen customers who submitted positive testimonials—

actually utilized the webpages to order OnlineSupplier. (*See supra* Part III.A.3.iii.)

**1080**

The FTC has satisfied the first prong for individual liability. The evidence abundantly establishes that from June 2005 to November 2007, Mr. Gugliuzza participated in and had authority to control the deceptive website marketing of OnlineSupplier. Mr. Gugliuzza's total involvement with Commerce Planet spanned three years from May 2005 to May 2008. Mr. Gugliuzza held the title of consultant, president, and director at Commerce Planet from July 2005 to November 2007. During the relevant time period, Mr. Gugliuzza wielded considerable authority and power at the company. He served as a top executive, oversaw and directed the company's operations, and had authority to control the activities of the various department heads, including Mr. Gravitz and the company's in-house counsel. Mr. Gugliuzza was involved in making core decisions that affected the operations of Commerce Planet and its subsidiaries, including the marketing of OnlineSupplier.

### (i) Role as Consultant

Although a titular consultant from July 2005 to September 2007, the evidence shows that Mr. Gugliuzza at least shared, if not supplanted, Mr. Hill's role as CEO and president. Mr. Hill testified that when Mr. Gugliuzza was hired as a consultant, his own authority was curtailed and that his responsibilities changed from overseeing the company's day-today operations to implementing Mr. Gugliuzza's recommendations. (Hill, 2/7/12, 129:14–130:6.) The Board of Directors conferred upon Mr. Gugliuzza a large portion of Mr. Hill's authority to help manage the company, which included the day-to-day oversight over marketing and supervising Mr. Gravitz. (Hill, 2/7/12, 129:14–130:6; Hill, 2/17/12, 121:9–25.) While still a consultant, Mr. Gugliuzza signed an "Executive Compensation" agreement with Commerce Planet in March 2006, which entitled him

to the same terms of compensation as Mr. Hill. (Foucar, 2/16/12, 167:24–168:13; Exhs. 16, 1331.) Mr. Gugliuzza, in fact, had identified the company's "dire need of a leader" with management skills in his report, (Exh. 6), and it appears that Mr. Gugliuzza filled that role from the very beginning. (See Hill, 2/7/12, 137:20–138:7 (testifying that Mr. Gugliuzza "was given the authority by the Board to ultimately take over the entire operation of the company and was told to replace me").) Mr. Gugliuzza also had the power to negotiate contracts on behalf of Commerce Planet and did so in 2005 with respect to Ne-Wave's contract with Netchemistry, a vendor for the company that hosted and managed the store-builder product software for OnlineSupplier. (Cruttenden, 2/28/12, 5:11–17, 40:11–42:1.) Mr. Gugliuzza had the power to hire and fire and exercised that authority with respect to various employees at Commerce Planet, including Paul Daniel, whom he terminated as the company's CFO, and David Foucar whom he hired to replace Mr. Daniel in June 2006. (Hill, 2/17/12, 129:19–130:9; Gugliuzza, 2/22/12, 46:4–7; Foucar, 2/16/12, 130:24–25.)

Mr. Gugliuzza also oversaw and regularly met with department heads, who were required to submit weekly reports to him. (Hill, 2/7/12, 132:9–133:24; Gugliuzza, 2/23/12 Vol. I, 57:8–11; Exhs. 1124, 1130, 1354, 1356, 1368–71, 1292a, 1293, 1295.) Specifically, Mr. Gugliuzza had supervisory authority over Aaron Gravitz, who was responsible for marketing OnlineSupplier. (Hill, 2/7/12, 134:20–135:3; Gravitz, 2/2/12, 122:3–11.) Mr. Gravitz reported directly to Mr. Gugliuzza and met with him daily. (Hill, 2/7/12, 136:21–23, 137:13–19.) Mr. Gugliuzza also set marketing goals, budgets, and action items. (Exh. 1120.) Although Mr. Gugliuzza did not come up with the design or concept of OnlineSuppli-

er's webpages or the use of a negative option plan, he oversaw the company's transition from telemarketing to online marketing in 2005. (Hill, 2/17/12, 122:1–4; Daniel, 2/14/12, 28:15–23.) Mr. Hill testified that Mr. Gugliuzza made the decision to transition from telemarketing to internet marketing because the cost in generating orders was much higher for the former. (Gravitz, 2/1/12, 44:19–45:12.) Mr. Gugliuzza also became involved in reviewing OnlineSupplier's sign-up pages and advertising materials. (*Id.* at 17:13–14.) Mr. Gugliuzza testified that he saw, reviewed, and approved various versions of the sign-up pages: "I know there are versions that I had reviewed and commented on and approved to some [degree]." (Gugliuzza, 2/21/12, 179:12–20.) Mr. Gravitz testified that he submitted all marketing materials to Mr. Gugliuzza or Jeffrey Conrad and believed that he would be terminated if he ran an advertisement that was not approved by them. (Gravitz, 2/2/12, 48:25–49:17, 119:12–120:5; Exh. 108.) Mr. Gugliuzza specifically made decisions to increase the traffic to OnlineSupplier's landing pages, such as by allotting more money to media to drive consumers to landing pages. (Gravitz, 2/1/12, 64:11–23.) Mr. Gugliuzza also made the decision to incrementally increase the price of OnlineSupplier from $29.95 to $59.95 per month. (*Id.* at 66:24–67:8.) The evidence shows that Mr. Gugliuzza participated in and had authority to control the website marketing of OnlineSupplier as a consultant.

#### (ii) **Role as President**

Although Mr. Gugliuzza formally served as president of Commerce Planet from September 2006 to November 2007, the evidence shows that he had already been serving as a *de facto* executive of Commerce Planet since July 2005. As a practical matter, his responsibilities and duties did not materially change. (Hill, 2/7/12,

153:18–25.) Mr. Gugliuzza continued to have operational control over the company and its subsidiaries and had oversight over the department heads. (Foucar, 2/16/12, 137:19–138:6.) Mr. Gugliuzza averred that as president of Commerce Planet, the "success of [the company's four subsidiaries] were important and ultimately rolled up to some degree and capacity to Commerce Planet, which [he] had responsibility for." (Gugliuzza, 2/22/12, 52:5–13.) Mr. Gugliuzza continued to oversee Mr. Gravitz and to be involved in the marketing of OnlineSupplier, including reviewing and approving its sign-up pages. (Hill, 2/7/12, 155:8–10, 155:11–20.) The evidence shows that Mr. Gugliuzza participated in and had the authority to control the website marketing of OnlineSupplier as the president of Commerce Planet.

#### 2. **Knowledge**

■■■ The knowledge requirement is satisfied by establishing that "the individual had actual knowledge of the material misrepresentation, was recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an intentional avoidance of truth." *Garvey*, 383 F.3d at 900 (citing *Publishing Clearing House, Inc.*, 104 F.3d at 1171). "The degree of participation in business affairs is probative of knowledge." *FTC v. Am. Standard Credit Sys.*, 874 F.Supp. 1080, 1089 (C.D.Cal.1994); *see also Amy Travel Serv.*, 875 F.2d at 574; *Affordable Media*, 179 F.3d at 1235 ("The extent of an individual's involvement in a fraudulent scheme alone is sufficient to establish the requisite knowledge for personal restitutionary liability.").

■■■ The evidence demonstrates that, at the very least, Mr. Gugliuzza was recklessly indifferent to the misleading representations of OnlineSupplier on its landing and billing pages. From his 30–day as-

sessment of the company in May 2005, Mr. Gugliuzza was able to acquire a fairly comprehensive understanding of the company's management, operations, technology, finances, marketing, customer service, and personnel. (Exh. 6.) His report also shows that he was familiar with OnlineSupplier and the various ways it was marketing. (*Id.*) Mr. Gugliuzza supervised Mr. Gravitz and the marketing of OnlineSupplier and oversaw the company's migration from telemarketing to online sign-ups. Mr. Gugliuzza also should have been particularly well-tuned to the activities of the marketing department, as he identified marketing expenditures to be one of the largest contributors to the company's negative net profits in his assessment report. (*Id.*) Although Mr. Gugliuzza testified that each subsidiary was a separate entity and had its own president, (Gugliuzza, 2/22/12, 50:16–51:8), the record shows that he communicated fairly extensively and regularly with the department heads, met with them, and required them to submit weekly reports to him. This is consistent with Mr. Gugliuzza's goal of improving the communication and coordination among the departments in his assessment report.

Specifically, with respect to the landing and billing pages, the evidence shows that Mr. Gugliuzza knew or at least was recklessly indifferent to the fact that they were misleading. Mr. Gugliuzza testified that he had seen, reviewed, commented on, and approved various versions of the OnlineSupplier sign-up pages. (Gugliuzza, 2/21/12, 179:12–20, 179:21–180:22; Exh. 1026.) Mr. Seidel and Mr. Guardiola, the president and manager of CLG, respectively, reported to Mr. Gugliuzza and sent him weekly reports of the call logs in customer service that contained the cancellation rates and refund amounts. Mr. Gugliuzza had ample notice of consumer complaints, including the free-kit-only type of complaints to which Mr. Guardiola testified. (Guardiola,

2/21/12, 15:11–18, 17:7–23, 23:2–15, 27:8–21, 30:25–31:4; Exhs. 1292a, 1293–95.) Mr. Guardiola also testified that one of the primary suggested changes brought up during the weekly meetings was to enlarge the font of the disclosure. (Guardiola, 2/21/12, 16:14–19.) Mr. Guardiola testified that based on his weekly staff reports and meetings that Mr. Gugliuzza periodically attended, he believed Mr. Gugliuzza knew about the number and substance of the billing complaints received by the company. (*Id.* at 32:14–23.) Mr. Gravitz and Mr. Hill testified that when Commerce Planet received complaints, they discussed them with Mr. Gugliuzza. (Gravitz, 2/1/12, 75:25–77:6; Exh. 1027; Hill, 2/7/12, 155:21–156:12, 160:10–161:25; 163:18–164:10.) Mr. Hill and others discussed the problem of OnlineSupplier's chargeback rates with Mr. Gugliuzza. (Hill, 2/7/12, 156:13–157:9; Exhs. 186–87, 1289) Mr. Hill testified that OnlineSupplier's chargeback problems were never resolved and remained above the 1% threshold for almost the entire time that Mr. Gugliuzza worked at the company. (Hill, 2/7/12, 168:9–25.) Mr. Gugliuzza also rejected the company's experiments in placing clearer disclosures and sending post-transaction emails because they hurt conversion rates. (Exh. 1097.) Mr. Gugliuzza's pervasive role and authority at Commerce Planet, which extended to almost every facet of the company's business and operations, also creates a strong inference that Mr. Gugliuzza had the requisite knowledge that OnlineSupplier's webpages were misleading. *American Standard Credit Systems*, 874 F.Supp. at 1089; *Amy Travel Serv.*, 875 F.2d at 574; *Affordable Media*, 179 F.3d at 1235. Accordingly, Mr. Gugliuzza had the requisite knowledge to be held individually liable for the deceptive website marketing of OnlineSupplier.

In his defense, Mr. Gugliuzza testified that it never once occurred to him during his entire tenure at Commerce Planet that people were being misled by the webpages. (Gugliuzza, 2/21/12, 182:16–21.) This is simply not credible in light of all the evidence of consumer confusion and Mr. Gugliuzza's extensive role at the company from 2005 to 2007. Mr. Gugliuzza also adamantly insisted that he did not attempt in any way to mislead consumers. (*Id.* at 100:23–24.) Commerce Planet's other officers and employees also consistently maintained that they did not believe that the company was intending to deceive consumers or to perpetuate a fraudulent internet scheme. (*See, e.g.,* Seidel, 2/14/12, 114:6–14.) However, proof that the defendant intended to deceive consumers or acted in bad faith is unnecessary to establish a section 5(a) violation. *World Travel Vacation Brokers,* 861 F.2d at 1029; *Feil,* 285 F.2d at 896. Mr. Gugliuzza further testified that he believed OnlineSupplier's webpages gave clear and conspicuous notice of the continuity program. (Gugliuzza, 2/23/12 Vol. I, 32:23–33:1, 33:7–13, 35:13–23.) Commerce Planet's other officers and employees concurred that they believed that the landing and billing pages gave clear notice of the terms of membership. (*See, e.g.,* Gravitz, 2/2/12, 36:23–37:3; Hill, 2/17/12, 88:2–6, 114:25–115:2; Seidel, 2/14/12, 125:9–126:23.) The relevant test, however, as to whether OnlineSupplier's webpages were misleading is from the perspective of a *reasonable consumer* confronted with the webpages, not that of the company's officers or employees who already had inside knowledge of how OnlineSupplier was being marketed and sold.

Finally, Mr. Gugliuzza argues that he did not know OnlineSupplier's webpages were misleading because there is no specific statute, law, or industry standard banning the use of a negative option plan or specifying how a negative option plan should be disclosed. (*See* Def.'s Closing Brief, at 47–48; Def.'s Closing Rebuttal, at 6.) This argument is unpersuasive. Although there is no specific law or industry standard prohibiting the use of a negative option plan or a bright-line rule on how such a plan should be disclosed, the FTC's Dot.Com Disclosures on internet advertising was published in May 2000 and readily available to Commerce Planet before its sign-up pages were live. (Gravitz, 2/2/12, 118:19–119:5; Exh. 377.) The Dot.com Disclosures provided guidelines on how to make clear and conspicuous disclosures that are consistent with the "net impression" test and principles of usability identified by Ms. King. (Exh. 377.) More importantly, the test under section 5(a) draws on well-established principles of advertising law and common sense. A bright-line rule on how precisely to disclose a negative option plan on a webpage is practically impossible, given the myriad variations of products, services, and webpages that are both extant and imaginable. Such a rule also calls for a rigid formula that undermines the very usefulness and flexibility of the law permitting it to be applied to a multitude of factual circumstances under sustained principles.

### D. Advice of Counsel and Good Faith

In his Answer to the FAC, Mr. Gugliuzza asserted several affirmative defenses, including advice of counsel, reliance on professionals, and good faith. Mr. Gugliuzza alleged that the FTC's claims are barred because he relied on the advice of counsel and professionals and acted in good faith. (Answer to FAC, at 8–9; *see also* Def.'s Trial Brief, at 3.) Specifically, Mr. Gugliuzza's defense is that he relied in good-faith on the advice of Commerce Planet's two in-house counsel, Jeffrey Conrad and Paul Huff, as to whether OnlineSupplier's sign-up pages were compliant un-

der the FTC Act. (*See* Def.'s Trial Brief, at 12.)

■ Neither of these affirmative defenses has merit. As a matter of law, advice of counsel and good faith are not defenses to whether the defendant had the requisite knowledge under section 5(a). " '[R]eliance on advice of counsel [is] not a valid defense on the question of knowledge' required for individual liability." *Cyberspace.com*, 453 F.3d at 1202 (quoting *Amy Travel Serv.*, 875 F.2d at 575). This is because counsel cannot sanction something that the defendant should have known was wrong. *Amy Travel Serv., Inc.*, 875 F.2d at 575 ("Obtaining the advice of counsel did not change the fact that the business was engaged in deceptive practices."). Good faith is also irrelevant to the question of knowledge. *See Feil*, 285 F.2d at 896 ("Whether good or bad faith exists is not material, if the Commission finds that there is likelihood to deceive."); *World Travel Vacation Brokers*, 861 F.2d at 1029 ("An advertiser's good faith does not immunize it from responsibility for its misrepresentations." (citation and quotes omitted)).

Furthermore, the record does not support a finding that Mr. Gugliuzza relied in good-faith on the advice of Commerce Planet's in-house counsel as to whether OnlineSupplier's webpages complied with the FTC Act. Neither Mr. Conrad nor Mr. Huff had experience or specialized knowledge in regulatory or advertising law. They also were not hired specifically to review the landing and billing pages of OnlineSupplier for compliance under the FTC Act. The evidence does not demonstrate that Mr. Gugliuzza deferred to the legal advice of Mr. Conrad or Mr. Huff. Rather, the record shows that Mr. Gugliuzza had superseding authority over both in-house counsel. For example, Mr. Conrad initially performed general business consulting for the company in January 2004 and then began reviewing advertisements and promotional materials in mid–2004. (Conrad, 2/8/12, 39:15–40:17; Exh. 100.) Mr. Conrad, however, did not have a background in advertising law. (Conrad, 2/8/12, 41:3–9.) Mr. Conrad and Mr. Gugliuzza shared the role of reviewing legal materials, and Mr. Gugliuzza eventually replaced Mr. Conrad as legal counsel and assumed responsibility for reviewing the marketing materials. (Gravitz, 2/1/12, 15:21–16:9; Hill, 2/7/12, 139:11–140:8.) Mr. Gugliuzza also held himself out to be legal counsel of OnlineSupplier, Inc. (Hill, 2/7/12, 140:9–141:13; Exh. 177.) Mr. Gugliuzza reviewed Mr. Gravitz's work to ensure that the email creatives and OnlineSupplier's sign-up pages produced by Mr. Gravitz and his team complied with applicable laws from 2005 to 2006. (Hill, 2/17/12, 122:8–13.) Mr. Gugliuzza testified that before Mr. Huff was hired, he was doing most of the legal review for the company. (Gugliuzza, 2/22/12, 119:5–14.) In effect, Mr. Gugliuzza acted as Commerce Planet's *de facto* legal counsel.

Similarly, Mr. Huff, who had a background in business and employment litigation, did not have any experience in FTC Act compliance or advertising law before working at Commerce Planet. (Huff, 2/15/12, 47:15–48:5, 50:15–19.) Mr. Huff was hired as in-house by Commerce Planet to review contracts and for litigation, rather than for the purpose of reviewing OnlineSupplier's sign-up pages. (*Id.* at 49:1–25, 50:20–25, 53:9–16.) Mr. Gugliuzza delegated some responsibilities to Mr. Huff, but Mr. Huff reported to Mr. Gugliuzza, who had authority to overrule him on legal matters. (Gravitz, 2/1/12, 35:1–8; Gravitz, 2/2/12, 120:14–19; Huff, 2/15/12, 54:1–8.) Mr. Gravitz continued to seek legal advice from Mr. Gugliuzza, and both Mr. Huff and Mr. Gugliuzza gave their input to Mr.

Gravitz on the marketing materials for OnlineSupplier. (Gravitz, 2/1/12, 52:4–6; Gravitz, 2/2/12, 122:12–25; Exh. 2017.) Mr. Huff reviewed the sign-up pages for OnlineSupplier, (Exhs. 213, 214), but there was no procedure in place whereby Mr. Gravitz had to submit entire pages to Mr. Huff for approval before they could be placed live on the internet. (Huff, 2/15/12, 82:7–13.) Thus, although Mr. Gugliuzza at least shared the duties with Mr. Huff in reviewing OnlineSupplier's marketing materials for legal compliance, Mr. Gugliuzza had superseding authority over Mr. Huff.

Mr. Gugliuzza did not offer evidence showing that he relied on any specific recommendations or approvals from Mr. Huff regarding OnlineSupplier's webpages. The defense makes much of the fact that in early 2007, Mr. Gugliuzza directed Mr. Huff to attend a conference in Washington D.C. on the possibility of new guidelines on acceptable marketing practices for negative options. (*Id.* at 54:2–65:17; Exh. 1193.) While Mr. Huff attended the conference and changes were subsequently implemented to OnlineSupplier's landing and billing pages in February 2007, (Exh. 1198), the evidence does not show that Mr. Huff conducted a meaningful, independent review of the entire OnlineSupplier sign-up process, that he recommended changes that Mr. Gugliuzza and Mr. Gravitz adopted as reflected in Version II, or that he approved any specific changes to the sign-up pages. (Huff, 2/15/12, 73:22–86:21; Exh. 1203.)[14] Instead, Mr. Gugliuzza and Mr. Gravitz requested that Mr. Huff give his oral opinion about certain print-outs of OnlineSupplier's sign-up pages that had already incorporated some changes and included handwritten comments by Mr. Gugliuzza. (Huff, 2/15/12, 70:8–73:15; Huff, 2/16/12, 56:6–13; Exhs. 1197.) Mr. Huff testified that he informed Mr. Gugliuzza and Mr. Gravitz that the changes were improvements, but expressed ambivalence regarding his qualifications and ability to say whether the pages complied with the FTC Act without reviewing the entire sign-up process, conducting additional research, and getting assistance from outside counsel. (Huff, 2/15/12, 70:8–73:15; Huff, 2/16/12, 56:6–13; Exhs. 1197.)

Commerce Planet did not conduct a comprehensive review of the landing and billing pages until after the CID was served on the company in March 2008 and in conjunction with outside counsel, Linda Goldstein, who was experienced in the area of FTC Act compliance. (Huff, 2/15/12, 72:8–19, 93:13–95:22.) Although Commerce Planet utilized outside counsel for certain matters, including the company's use of the eBay logo, contracts with third-party marketers, and securities filings, the company did not specifically hire outside counsel to review OnlineSupplier's sign-up pages for compliance with the FTC Act until after Mr. Gugliuzza stepped down as president and the CID was served on the company. (Hill, 2/7/12, 178:18–21; Hill, 2/17/12, 92:11–93:22, Gravitz, 2/1/12, 108:10–21.) In sum, the evidence does not show that Mr. Gugliuzza relied in good faith on the advice of Mr. Conrad or Mr. Huff as to whether the sign-up pages complied with the FTC Act.

## IV. REMEDIES

▉ The FTC requests both a permanent injunction against Mr. Gugliuzza and

---

**14.** At the conference, Mr. Huff learned that there were already guidelines in place and established law requiring companies to disclose clearly and conspicuously material terms of an offer to consumers before they complete a transaction. (Huff, 2/15/12, 65:18–24.) Mr. Huff testified that he started to draft an email with recommended changes to the landing and billing pages, but he never sent the email to Mr. Gugliuzza or Mr. Gravitz. (*Id.*)

monetary equitable relief, including restitution and disgorgement. (FAC ¶ 55 & Prayer.) Under section 13(b) of the FTC Act, the FTC "may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b); *see also FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1086 (9th Cir.1985). "This provision gives the federal courts broad authority to fashion appropriate remedies for violations of the Act," *Pantron I Corp.*, 33 F.3d at 1102, including "any ancillary relief necessary to accomplish complete justice," *H.N. Singer*, 668 F.2d at 1113.

## A. Permanent Injunction

■ A permanent injunction is justified if there exists "some cognizable danger· of recurrent violation," *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), or "some reasonable likelihood of future violations," *CFTC v. Co Petro Marketing Group, Inc.*, 502 F.Supp. 806, 818 (C.D.Cal.1980), *aff'd*, 680 F.2d 573 (9th Cir.1982). The Court examines the totality of the circumstances involved and a variety of factors in determining the likelihood of future misconduct. *Co Petro Marketing Group*, 502 F.Supp. at 818; *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir.1980). Nonexhaustive factors include the degree of scienter involved, whether the violative act was isolated or recurrent, whether the defendant's current occupation positions him to commit future violations, the degree of harm consumers suffered from the unlawful conduct, and the defendant's recognition of his own culpability and sincerity of his assurances, if any, against future violations. *Murphy*, 626 F.2d at 655; *FTC v. Magui Publishers, Inc.*, No. 89–3818, 1991 WL 90895, at *15–16, 1991 U.S. Dist. LEXIS 20452, at *44–*45 (C.D.Cal. Mar. 28, 1991).

■ The Court finds that a permanent injunction against Mr. Gugliuzza is appropriate under the circumstances to enjoin him from engaging in similar misleading and deceptive marketing of products and services. Here, Mr. Gugliuzza did not participate in an isolated, discrete incident of deceptive marketing, but engaged in sustained and continuous conduct that perpetuated the deceptive marketing of OnlineSupplier for over two years. Mr. Gugliuzza oversaw the migration from telemarketing to internet marketing of OnlineSupplier and served as a key leader and executive of the company. Mr. Gugliuzza supervised and had authority over Mr. Gravitz and the marketing of OnlineSupplier as well as over the company's in-house counsel. Mr. Gugliuzza reviewed and approved the various iterations of OnlineSupplier's sign-up pages and, at the very least, was recklessly indifferent to the fact that OnlineSupplier's webpages were misleading,· given the ample notice of consumer confusion regarding OnlineSupplier's membership terms. Mr. Gugliuzza assessed the financial state of the company and helped turn Commerce Planet into a profitable business, mainly through the internet marketing and sale of OnlineSupplier from 2005 to 2007. Mr. Gugliuzza did not express any recognition of his culpability, but has firmly stood behind the sign-up pages and has obdurately insisted that at no time did he ever believe consumers were misled by OnlineSupplier's billing and landing pages. (Gugliuzza, 2/21/12, 182:16–21; 2/22/12, 152:3–8.) Instead, Mr. Gugliuzza placed blame on third-party marketers and the advice of in-house counsel—defenses that the Court has found thin in evidentiary support. All these factors weigh in favor of imposing a permanent injunction against Mr. Gugliuzza.

■ In his Answer to the FAC, Mr. Gugliuzza asserted mootness as an affirmative defense. He alleged that "because the challenged conditions no longer exist,

or have never existed ... there is no likelihood of recurrence." (Answer to FAC, at 9.) It is uncontested that Mr. Gugliuzza is no longer involved in marketing OnlineSupplier at Commerce Planet since his departure from the company in 2007. However, as a general rule, mere voluntary cessation of the violative conduct does not render the case moot. *W.T. Grant Co.*, 345 U.S. at 632, 73 S.Ct. 894. If it did, the courts would be compelled to leave the defendant free to return to his old ways. *United States v. Concentrated Phosphate Export Ass'n, Inc.*, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968); *Affordable Media*, 179 F.3d at 1238 ("The reason that the defendant's conduct, in choosing to voluntarily cease some wrongdoing, is unlikely to moot the need for injunctive relief is that the defendant could simply begin the wrongful activity again.") Nevertheless, a case may be moot if "the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated." *W.T. Grant Co.*, 345 U.S. at 633, 73 S.Ct. 894 (citation and quotes omitted); *accord TRW, Inc. v. FTC*, 647 F.2d 942, 953 (9th Cir.1981). The burden of demonstrating mootness is "a heavy one." *W.T. Grant Co.*, 345 U.S. at 633, 73 S.Ct. 894. "[I]t must be 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *TRW, Inc.*, 647 F.2d at 953 (quoting *Concentrated Phosphate Export Ass'n*, 393 U.S. at 203, 89 S.Ct. 361).

Mr. Gugliuzza has not shown that it is "absolutely clear" that he will not repeat his wrongful activities. Since leaving Commerce Planet, Mr. Gugliuzza has founded Grow Commerce, a website servicer for businesses, and has worked for Oakley, a sunglass company, as an e-Commerce strategy manager. Mr. Gugliuzza also testified that after the completion of trial he planned to work for "Trust Com-

merce," a merchant processor. (Gugliuzza, 2/21/12, 130:11–131:14.) Mr. Gugliuzza pointed out that none of his post-Commerce Planet activities have involved direct consumer marketing of a continuity program. Before joining Commerce Planet, Mr. Gugliuzza also never marketed a continuity program or was held liable for violations of the FTC Act. Mr. Gugliuzza further testified that after five years of his last contact with Commerce Planet, he "wouldn't touch a negative option with a ten-foot pole." (Gugliuzza, 2/23/12 Vol. II, 39:2–11.) While Mr. Gugliuzza has not specifically engaged in the internet marketing of a negative option plan before or after his involvement with Commerce Planet, Mr. Gugliuzza has consistently worked for an e-Commerce company engaged in the internet marketing of a product or service. He began his post-law school career co-founding a company that marketed and sold batteries to consumers online. He then founded a competitor website that marketed and sold the same products online. After leaving Commerce Planet, Mr. Gugliuzza promptly founded Grow Commerce, another website servicer, and then joined Oakley as an e-Commerce strategy manager. For all these companies, Mr. Gugliuzza was the founder and/or executive and profited considerably from the website marketing of products and services. At Commerce Planet, he earned over $3 million from 2006 to 2007. Mr. Gugliuzza also expressed plans to join another e-Commerce company at the end of trial. Given his past work experience and financial rewards, there is a reasonable likelihood that Mr. Gugliuzza will be incentivized to continue his work in e-Commerce and be involved in the internet marketing of products or services. It is also reasonably likely that Mr. Gugliuzza will seek to serve in an executive position, given his prior leadership roles and eagerness

to pursue such positions. The Court finds that Mr. Gugliuzza's involvement in e-Commerce will afford him further opportunities where he may, once again, engage in misleading and deceptive marketing of a product or service. The fact that Mr. Gugliuzza has not engaged in marketing of a negative option plan since leaving Commerce Planet (or assurances that he will not be involved in such marketing in the future) is not sufficient, as the marketing of a product or service involves various aspects—such as product description and price—that may be manipulated without resorting to a negative option plan. The Court is persuaded that under the circumstances of this case, there is a cognizable danger that Mr. Gugliuzza will engage in similar violative conduct. Permanent injunctive relief is therefore warranted against Mr. Gugliuzza.

## B. Monetary Equitable Relief

Section 13(b) permits a panoply of equitable remedies, including monetary equitable relief in the form of restitution and disgorgement, as well as miscellaneous reliefs such as asset freezing, accounting, and discovery to aid in providing redress to injured consumers. *Pantron I Corp.*, 33 F.3d at 1103 & n. 34 (9th Cir.1994); *Figgie Int'l*, 994 F.2d at 606–608; *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982).

### 1. Restitution and Disgorgement

■■■■ The FTC Act is designed to protect consumers from economic injuries. *Stefanchik*, 559 F.3d at 931. To effect that

purpose, courts may award restitution to redress consumer injury. *Gill*, 265 F.3d at 958 ("We have held that restitution is a form of ancillary relief available to the court in these circumstances to effect complete justice."). Restitution may be measured by the "the full amount lost by consumers rather than limiting damages to a defendant's profits." *Stefanchik*, 559 F.3d at 931 (affirming restitution of over $17 million for the full amount of consumer loss); *see also FTC v. Febre*, 128 F.3d 530, 536 (7th Cir.1997) (affirming restitution for more than $16 million against company and officer as consumer loss under section 13(b)). Consumer loss is calculated by "the amount of money paid by the consumers, less any refunds made." *FTC v. Direct Marketing Concepts, Inc.*, 648 F.Supp.2d 202, 213–14 (D.Mass.2009), *aff'd*, 624 F.3d 1 (1st Cir.2010); *see also Stefanchik*, 559 F.3d at 931; *Figgie Int'l*, 994 F.2d at 606; *Gill*, 265 F.3d at 958.

■■■ As an alternative to restitution, "[s]ection 13(b) permits a district court to order a defendant to disgorge illegally obtained funds." *Febre*, 128 F.3d at 537. Disgorgement is measured by the amount of profits causally connected to the violation. *SEC v. Happ*, 392 F.3d 12, 31 (1st Cir.2004). The purpose of disgorgement is not to redress consumer injuries but to deprive wrongdoers of ill-gotten gains. *Febre*, 128 F.3d at 537.[15]

■■■ Irrespective of the measure used to calculate monetary equitable relief, courts apply a burden-shifting framework

---

**15.** The Court notes that there appears to be some inconsistency in the use of the term restitution and disgorgement, which, at times, have been used interchangeably and/or with imprecision. *See, e.g., Figgie Int'l*, 994 F.2d at 606 ("While ordinarily the proper measure of restitution is the amount of enrichment received, if the loss suffered by the victim is greater than the unjust benefit received by the

defendant, the proper measure of restitution may be to restore the status quo." (citation and quotes omitted)); *Direct Marketing Concepts*, 648 F.Supp.2d at 218 (applying the term disgorgement to mean monetary relief as measured by consumer loss). To avoid confusion, the Court uses the term "consumer redress" to mean restitution.

to determine the specific amount to award. *Direct Marketing Concepts,* 624 F.3d at 15. First, the FTC bears the initial burden of providing the district court with a reasonable approximation of the monetary relief to award. *Id.; Febre,* 128 F.3d at 535. A reasonable estimate, rather than an exact amount, is proper because that may be the only information available, as when defendants do not maintain data necessary to calculate the precise amount. *FTC v. QT, Inc.,* 512 F.3d 858, 864 (7th Cir.2008) ("A court is entitled to proceed with the best available information. . . ."); *FTC v. Verity Int'l, Ltd.,* 443 F.3d 48, 69 (2d Cir.2006) ("Of course, the reasonableness of an approximation varies with the degree of precision possible."), *cert. denied,* 549 U.S. 1278, 127 S.Ct. 1868, 167 L.Ed.2d 317 (2007). Second, once the FTC satisfies this burden, "the defendant has an opportunity to demonstrate that the figures are inaccurate." *F.T.C. v. Direct Marketing Concepts,* 624 F.3d 1, 15 (1st Cir.2010); *see also QT,* 512 F.3d at 864. "Any fuzzy figures due to a defendant's uncertain bookkeeping cannot carry a defendant's burden to show inaccuracy." *Direct Marketing Concepts,* 624 F.3d at 15; *Febre,* 128 F.3d at 535 ("[T]he risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty." (citation and quotes omitted)).[16]

### 2. Calculation of Consumer Loss

In the FAC, the FTC alleged that between July 2005 and March 2008, Commerce Planet obtained over $45 million from over 500,000 consumers. (FAC ¶ 27.) In its Closing Brief, the FTC requests a maximum amount of $36.4 million in consumer loss after adjustments or, at a minimum, $18.2 million. (Pl.'s Closing Brief, at 52.) The FTC relies on calculations performed by Dr. Daniel Becker, an expert in the field of Econometrics, who has worked for the FTC in the areas of enforcement, policy issues, and consumer protection. (Becker, 2/15/12, 7:24–12, 8:13–8, 8:19–9:11.) The FTC requested that Dr. Becker calculate the net consumer injury for consumers who enrolled in OnlineSupplier's membership program between July 2005 and March 2008. (*Id.* at 10:2–6.) The FTC also requested that Dr. Becker apply two assumptions: (i) no consumer would have joined OnlineSupplier if the nature of the membership had been fully disclosed to them, and (ii) consumers derived no benefit from their OnlineSupplier memberships. (*Id.* at 10:17–24.) Dr. Becker used Commerce Planet's RT3 database containing customer records and transactions involving OnlineSupplier. (*Id.* at 10:13–16.) Using the information from the RT3 database, Dr. Becker employed two steps to calculate the amount of consumer injury. (*Id.* at 18:3–20:10.) First, he calculated the population of injured consumers who purchased OnlineSupplier and created a subset of data that only contained consumers who signed up for the program with an order date between July 1, 2005 to March 31, 2008. Second, he calculated the net payments from the population of consumers who purchased OnlineSupplier during the relevant time period by adding up all the payments. Dr. Becker then subtracted off the refunds and chargeback amounts from the payments. (*Id.* at 18:21–24.)[17] Dr. Becker

---

**16.** In his opening brief, Mr. Gugliuzza argued that monetary equitable relief contains a tracing element and that the evidence does not show OnlineSupplier's revenue is traceable to Mr. Gugliuzza. (Def.'s Trial Brief, at 18.) Mr. Gugliuzza proffered the same argument in his motions for partial summary judgment, which the Court rejected. (*See* Ct. Order, Dkt. No. 164, Sept. 8, 2011.)

**17.** The total payments per month were based on the enrollment month rather than the pay-

finally calculated the consumer injury for the period corresponding to Mr. Gugliuzza's tenure as consultant (July 2005 to August 2006) and his tenure as president (September 2006 to October 2007) as follows:

| Time Period | Consumer Injury |
| --- | --- |
| Consultant (July 1, 2005 to August 31, 2006) | $19.1 million |
| President (September 1, 2006 to October 31, 2007) | $19.6 million |
| **Total Consumer Injury** | **$38.7 million** |

(*Id.* at 20:11–21:4; *see also* Pl.'s Closing Brief, at 50–51.)

In its Closing Brief, the FTC provided an adjusted estimate. Mr. Gugliuzza's accounting expert, Dr. Stefano Vranca, pointed out that Dr. Becker used data from the company's RT3 database rather than from its Quickbooks database,[18] which resulted in the omission of additional chargebacks and refunds. (Vranca, 2/28/12, 95:2–20.) The FTC agreed that Dr. Becker failed to account for a number of refunds and chargebacks that were processed after March 2008 because the RT3 database was cut off at that date. According to Dr. Vranca, the refunds and chargebacks to OnlineSupplier during the relevant time period totaled approximately $7.85 million compared to Dr. Becker's figure of approximately $6 million, a difference of $1.85 million. (Pl.'s Closing Brief, at 51 (citing Vranca, 2/28/12, 95:2–20, 116:6–19).) The FTC further acknowledged that Dr. Becker erroneously included in his refund amount the total payments for shipping and handling. (Pl.'s Closing Brief, at 51–52 (citing Vranca, 2/28/12, 94:16–20).) The FTC deducted a total of $2.35 million from the original estimate, applied proportionally across the time periods, and provided the following revised figures:

| Time Period | Original Calculation of Consumer Injury | Adjusted Calculation of Consumer Injury |
| --- | --- | --- |
| Consultant (July 1, 2005 to August 31, 2006) | $19.1 million | $18 million |
| President (September 1, 2006 to October 31, 2007) | $19.6 million | $18.4 million |
| **Total Consumer Injury** | **$38.7 million** | **$36.4 million** |

(Pl.'s Closing Brief, at 52.)

Mr. Gugliuzza challenged the accuracy of Dr. Becker's estimate through the rebuttal testimony of Dr. Vranca. Dr. Vranca testified that the two assumptions applied by Dr. Becker—that no consumer would have joined OnlineSupplier if she had known about the terms of membership and consumers derived no benefit from the program—were unsupported. Dr. Vranca testified that a certain percentage of consumers cancelled within the free trial period or maintained their membership in excess of three or six months, suggesting that some consumers knew about the terms of membership and yet purchased

---

ment month, *i.e.*, the monthly payment calculation incorporated all the payments in the month during which the consumers signed up for OnlineSupplier, irrespective of whether the payment was made in a subsequent month.

**18.** The Quickbooks database was Commerce Planet's account system and system of records. All relevant financial information of the company was contained in Quickbook files. (Foucar, 2/16/12, 143:7–13, 166:4–10; Rovelo, 2/10/12, 22:22–23:13.) The company's financial data was transferred to the FTC on hard drives in a Microsoft Access RT3 format. (Exh. 31.)

the program. (Vranca, 2/28/12, 74:3–76:5, 80:5–13, 84:3–22; Exhs. 2062–63.) Dr. Vranca also testified that consumers derived some value from the product, as evidenced by the company's expenditure in staffing the customer service center. (*Id.* at 120:10–121.15.)

▌ Dr. Vranca's critique is flawed in several respects. The Court agrees with the FTC that, as a matter of law, the FTC need not show that all consumers were deceived, relied upon the misrepresentations, or that consumers did not derive any utility from the product. Under section 13(b) of the FTC Act, proof of injury by every individual consumer is not required to justify a restitutionary award. *Stefanchik,* 559 F.3d at 929 n. 12 (citation omitted); *Figgie Int'l,* 994 F.2d at 605 ("It is well established with regard to Section 13 of the FTC Act ... that proof of individual reliance by each purchasing customer is not needed.") This is because, unlike a private suit for fraud, "[s]ection 13 serves a public purpose by authorizing the Commission to seek redress on behalf of injured consumers," and "[r]equiring proof of subjective reliance by each individual consumer would thwart effective prosecutions of large consumer redress actions and frustrate the statutory goals of the section." *Figgie Int'l, Inc.,* 994 F.2d at 605 (citation omitted). Rather, "[a] presumption of actual reliance arises once the Commission has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product." *Id.; see also FTC v. Inc21.com Corp.,* 745 F.Supp.2d 975, 1011 (N.D.Cal. 2010) ("[I]t is sufficient for the FTC to prove that misrepresentations were widely disseminated (or impacted an overwhelming number of consumers) and caused actual consumer injury."), *aff'd,* 475 Fed. Appx. 106 (9th Cir.2012). Nor does the

FTC need to prove that OnlineSupplier was essentially worthless to obtain restitution. *Figgie Int'l,* 994 F.2d at 606. This is because the injury occurs from the seller's misrepresentations that "tainted the customers' purchasing decisions"—it is "[t]he fraud in the selling, not the value of the thing sold" that entitles consumers to the refund. *Id.*

▌ Here, the FTC has proven that the representations of OnlineSupplier on its webpages as a free auction kit were materially misleading; the representations were widely disseminated on the internet; and numerous consumers ordered OnlineSupplier. Once the FTC has met this burden, it must then "show that its calculations reasonably approximated the amount of customers' net loss," and then the burden shifts to the defendant to show those figures are inaccurate. *Febre,* 128 F.3d at 535. Mr. Gugliuzza attempted to challenge Dr. Becker's figures by referencing Dr. Vranca's user data. However, Mr. Gugliuzza does not challenge the validity of the actual data used by Dr. Becker in the RT3 database. Dr. Vranca himself relied on the data in the RT3 database for many of his own calculations. (Vranca, 2/28/12, 74:3–10, 106:21–107:3.) Nor did Dr. Vranca take issue with the accurateness of Dr. Becker's mathematical calculations. (Vranca, 2/28/12, 110:18–113:13.) Moreover, Dr. Vranca's citation of user data does not necessarily track consumers who knew of OnlineSupplier's continuity program at the time they placed their order, as they may have simply not noticed the charges to their credit card for several months or discovered the terms of membership through a post-transaction communication. (Vranca, 2/28/12, 108:12–23; *see also supra* Part III.A.3.) The FTC has shown through overwhelming evidence that thousands of consumers were misled

by OnlineSupplier's webpages and suffered actual injury.

Nevertheless, although the FTC need not show that all consumers were misled, not all consumers were in fact deceived by OnlineSupplier's webpages. As discussed above in detail, the Court found that a reasonable consumer would likely be deceived by OnlineSupplier's webpages. Jennifer King testified that "most" consumers would not have known they were purchasing a negative option or signing up for a continuity program. (King, 2/3/12, 114:9–21.) José Guardiola testified that at least 70% of calls to the customer call center—about 1,000 calls per week—comprised free-kit-only complaints. (Guardiola, 2/21/12, 8:11–9:6, 31:20–32:13.) The FTC acknowledged that the Court may adjust their estimate of consumer injury using these approximations. Assuming that the lower bound of "most" is 50%, the FTC argued that the Court could reasonably find that the actual consumer injury was not less than 50% of $36.4 million or $18.2 million. (Pl.'s Closing Brief, at 54–55.) The FTC's second adjusted amount is summarized as follows:

| Time Period | Adjusted Calculation of Consumer Injury | 50% of Adjusted Calculation of Consumer Injury |
| --- | --- | --- |
| Consultant (July 1, 2005 to August 31, 2006) | $18 million | $9 million |
| President (September 1, 2006 to October 31, 2007) | $18.4 million | $9.2 million |
| **Total Consumer Injury** | **$36.4 million** | **$18.2 million** |

The Court finds that the FTC's second adjusted amount of $18.2 million to be appropriate and reasonable. The Court takes into account the inherent difficulty of tracking and retaining consumer data regarding consumers' experience that thwarts a precise calculation of consumer injury. The Court also considers the limitation of the financial data and records maintained by Commerce Planet as to the user experience with OnlineSupplier's website and services. (*See* Brooks, 2/9/12, 117:14–18; Seidel, 2/14/12, 101:18–102:20.) The evidence strongly supports the conclusion that most reasonable consumers would have been misled by OnlineSupplier's landing and billing pages. A conservative floor then is that at least 50% of consumers who ordered OnlineSupplier were misled by the sign-up pages, which results in a reduction of the FTC's original adjusted estimate by half. Accordingly, the Court finds $18.2 million to be a reasonably conservative estimate of consumer injury.

In response, Mr. Gugliuzza countered that the Court should not award any restitution because the consumer injury essentially amounts to zero. (Def.'s Closing Brief, at 58.) Mr. Gugliuzza relies on Dr. Vranca's expert opinion that he believed the consumer injury to be *de minimis* or zero, as estimated by applying three assumptions that defense counsel requested he adopt during his testimony: (i) if people were confused by the terms, they were primarily in the group that cancelled after getting billed once or twice within 60 days of signing up, (ii) there were some people in the zero to 60 day group who were not confused, but understood the terms and cancelled within the 60 days after being charged once or twice, and (iii) people who felt they were confused were the most likely to obtain refunds and chargebacks. (Vranca, 2/28/12, 100:16–102:23.) Based on these assumptions, and figuring in the to-

tal amount of chargebacks and refunds, Dr. Vranca opined that the amount of consumer loss would be almost nonexistent. (*Id.*) The Court finds this estimate implausible. As a preliminary matter, Dr. Vranca's assumptions are entirely unfounded and speculative. The evidence clearly establishes that there were confused consumers, such as Ms. Cirillo, who unwittingly purchased OnlineSupplier and were charged for the program for at least several months, but did not receive a full refund. Moreover, Dr. Vranca's testimony is not competent evidence of consumer injury, as he was not retained to give such an estimate and there was no expert disclosure for such testimony. The only estimate of consumer injury the Court may properly consider, as Dr. Vranca acknowledged, is that of Dr. Becker. (*Id.* at 105:1–23, 106:13–15.) Mr. Gugliuzza's estimate of zero injury is not reasonable or credible. Accordingly, Mr. Gugliuzza is liable for restitution in the amount of $18.2 million.

## V. CONCLUSION

For the foregoing reasons, the Court finds in favor of the FTC and against Mr. Gugliuzza on both counts for deceptive and unfair practices under section 5(a) of the FTC Act. The Court finds Mr. Gugliuzza individually liable for the deceptive and unfair marketing of OnlineSupplier in violation of section 5(a). The Court finds that a permanent injunction against Mr. Gugliuzza is warranted. The Court further awards the FTC restitution for consumer redress in the amount of $18.2 million. The FTC is directed to file a proposed permanent injunction and a proposed judgment consistent with the Court's decision within ten (10) days of this memorandum.